CAPPAERT ET AL. *v.* UNITED STATES ET AL.

No. 74–1107.   Argued January 12, 1976—Decided June 7, 1976*

---

*Together with No. 74–1304, *Nevada ex rel. Westergard* v. *United States et al.,* also on certiorari to the same court.

Burger, C. J., delivered the opinion for a unanimous Court.

130

*Samuel S. Lionel* argued the cause and filed briefs for petitioners in No. 74–1107. *George Allison*, Special Deputy Attorney General of Nevada, argued the cause for petitioner in No. 74–1304. With him on the briefs was *Peter D. Laxalt*, Special Deputy Attorney General.

*Deputy Solicitor General Randolph* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Bork, Acting Assistant Attorney General Kiechel, Harry R. Sachse, Jacques B. Gelin, John H. Germeraad*, and *Robert L. Klarquist*.†

---

†Briefs of *amici curiae* urging reversal in both cases were filed (1) for the States of Colorado, North Dakota, and Washington by *J. D. MacFarlane*, Attorney General of Colorado, *Jean E. Dubofsky*, Deputy Attorney General, *Edward G. Donovan*, Solicitor General, *David W. Robbins*, First Assistant Attorney General, *Charles M. Elliott*, Special Assistant Attorney General, *Allen I. Olson*, Attorney General of North Dakota, *Gerald W. Vandewalle*, Chief Deputy Attorney General, *Slade Gorton*, Attorney General of Washington, and *Charles B. Roe*, Senior Assistant Attorney General; and (2) for the States of Arizona, Hawaii, Idaho, Kansas, Montana, Nebraska, New Mexico, Oklahoma, South Dakota, Utah, and Wyoming by *Bruce Babbitt*, Attorney General of Arizona, *Ronald Y. Amemiya*, Attorney General of Hawaii, *Wayne L. Kidwell*, Attorney General of Idaho, *Curt T. Schneider*, Attorney General of Kansas, *Robert L. Woodahl*, Attorney General of Montana, *Paul L. Douglas*, Attorney General of Nebraska, *Antonio Anaya*, Attorney General of New Mexico, *Larry Derryberry*, Attorney General of Oklahoma, *William J. Janklow*, Attorney General of South Dakota, *Vernon B. Romney*, Attorney General of Utah, and *V. Frank Mendicino*, Attorney General of Wyoming.

*Bruce R. Green* and *Robert S. Pelcyger* filed a brief for the Salt River Pima-Maricopa Indian Community et al. as *amici curiae* urging affirmance in No. 74–1304.

*Evelle J. Younger*, Attorney General, *Carl Boronkay*, Assistant Attorney General, and *Roderick Walston, Richard C. Jacobs*, and *Douglas B. Noble*, Deputy Attorneys General, filed a brief for the State of California as *amicus curiae* in No. 74–1304.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented in this litigation is whether the reservation of Devil's Hole as a national monument reserved federal water rights in unappropriated water.

Devil's Hole is a deep limestone cavern in Nevada. Approximately 50 feet below the opening of the cavern is a pool 65 feet long, 10 feet wide, and at least 200 feet deep, although its actual depth is unknown. The pool is a remnant of the prehistoric Death Valley Lake System and is situated on land owned by the United States since the Treaty of Guadalupe Hidalgo in 1848, 9 Stat. 922. By the Proclamation of January 17, 1952, President Truman withdrew from the public domain a 40-acre tract of land surrounding Devil's Hole, making it a detached component of the Death Valley National Monument. Proclamation No. 2961, 3 CFR 147 (1949–1953 Comp.).[1] The Proclamation was issued under the American Antiquities Preservation Act, 34 Stat. 225, 16 U. S. C. § 431, which authorizes the President to declare as national monuments "objects of historic or scientific inter-

---

[1] The final paragraphs of the Proclamation withdrawing Devil's Hole from the public domain recite:

"Now, Therefore, I, Harry S. Truman, President of the United States of America, under and by virtue of the authority vested in me by section 2 of the act of June 8, 1906, 34 Stat. 225 (16 U. S. C. 431), do proclaim that, subject to the provisions of the act of Congress approved June 13, 1933, 48 Stat. 139 (16 U. S. C. 447), and to all valid existing rights, the following-described tract of land in Nevada is hereby added to and reserved as a part of the Death Valley National Monument, as a detached unit thereof:

"Mount Diablo Meridian, Nevada T. 17 S., R. 50 E., sec. 36, SW ¼ SE ¼.

"Warning is hereby expressly given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of this addition to the said monument and not to locate or settle on any of the lands thereof."

132

est that are situated upon the lands owned or controlled by the Government of the United States . . . ."

The 1952 Proclamation notes that Death Valley was set aside as a national monument "for the preservation of the unusual features of scenic, scientific, and educational interest therein contained." The Proclamation also notes that Devil's Hole is near Death Valley and contains a "remarkable underground pool." Additional preambulary statements in the Proclamation explain why Devil's Hole was being added to the Death Valley National Monument:

> "Whereas the said pool is a unique subsurface remnant of the prehistoric chain of lakes which in Pleistocene times formed the Death Valley Lake System, and is unusual among caverns in that it is a solution area in distinctly striated limestone, while also owing its formation in part to fault action; and

> "Whereas the geologic evidence that this subterranean pool is an integral part of the hydrographic history of the Death Valley region is further confirmed by the presence in this pool of a peculiar race of desert fish, and zoologists have demonstrated that this race of fish, which is found nowhere else in the world, evolved only after the gradual drying up of the Death Valley Lake System isolated this fish population from the original ancestral stock that in Pleistocene times was common to the entire region; and

> "Whereas the said pool is of such outstanding scientific importance that it should be given special protection, and such protection can be best afforded by making the said forty-acre tract containing the pool a part of the said monument . . . ."

The Proclamation provides that Devil's Hole should be supervised, managed, and directed by the National

Park Service, Department of the Interior. Devil's Hole is fenced off, and only limited access is allowed by the Park Service.

The Cappaert petitioners own a 12,000-acre ranch near Devil's Hole, 4,000 acres of which are used for growing Bermuda grass, alfalfa, wheat, and barley; 1,700 to 1,800 head of cattle are grazed. The ranch represents an investment of more than $7 million; it employs more than 80 people with an annual payroll of more than $340,000.

In 1968 the Cappaerts began pumping groundwater on their ranch on land 2½ miles from Devil's Hole; they were the first to appropriate groundwater. The groundwater comes from an underground basin or aquifer which is also the source of the water in Devil's Hole. After the Cappaerts began pumping from the wells near Devil's Hole, which they do from March to October, the summer water level of the pool in Devil's Hole began to decrease. Since 1962 the level of water in Devil's Hole has been measured with reference to a copper washer installed on one of the walls of the hole by the United States Geological Survey. Until 1968, the water level, with seasonable variations, had been stable at 1.2 feet below the copper marker. In 1969 the water level in Devil's Hole was 2.3 feet below the copper washer; in 1970, 3.17 feet; in 1971, 3.48 feet; and, in 1972, 3.93 feet.

When the water is at the lowest levels, a large portion of a rock shelf in Devil's Hole is above water. However, when the water level is at 3.0 feet below the marker or higher, most of the rock shelf is below water, enabling algae to grow on it. This in turn enables the desert fish (*cyprinodon diabolis*, commonly known as Devil's Hole pupfish), referred to in President Truman's Proclamation, to spawn in the spring. As the rock shelf be-

comes exposed, the spawning area is decreased, reducing the ability of the fish to spawn in sufficient quantities to prevent extinction.

In April 1970 the Cappaerts, pursuant to Nevada law, Nev. Rev. Stat. § 533.325 (1973), applied to the State Engineer, Roland D. Westergard, for permits to change the use of water from several of their wells. Although the United States was not a party to that proceeding and was never served, employees of the National Park Service learned of the Cappaerts' application through a public notice published pursuant to Nevada law. § 533.360. An official of the National Park Service filed a protest as did a private firm. Nevada law permits interested persons to protest an application for a permit; the protest may be considered by the State Engineer at a hearing. § 533.365. A hearing was conducted on December 16, 1970, and a field solicitor of the Department of the Interior appeared on behalf of the National Park Service. He presented documentary and testimonial evidence, informing the State Engineer that because of the declining water level of Devil's Hole the United States had commissioned a study to determine whether the wells on the Cappaerts' land were hydrologically connected to Devil's Hole and, if so, which of those wells could be pumped safely and which should be limited to prevent lowering of the water level in Devil's Hole. The Park Service field solicitor requested either that the Cappaerts' application be denied or that decision on the application be postponed until the studies were completed.

The State Engineer declined to postpone decision. At the conclusion of the hearing he stated that there was no recorded federal water right with respect to Devil's Hole, that the testimony indicated that the Cappaerts' pumping would not unreasonably lower the water table or adversely affect existing water rights, and that the

permit would be granted since further economic development of the Cappaerts' land would be in the public interest. In his oral ruling the State Engineer stated in part that "the protest to the applications that are the subject of this hearing are overruled and the applications will be issued subject to existing rights." The National Park Service did not appeal. See Nev. Rev. Stat. § 533.450 (1973).

In August 1971 the United States, invoking 28 U. S. C. § 1345,[2] sought an injunction in the United States District Court for the District of Nevada to limit, except for domestic purposes, the Cappaerts' pumping from six specific wells and from specific locations near Devil's Hole. The complaint alleged that the United States, in establishing Devil's Hole as part of Death Valley National Monument, reserved the unappropriated waters appurtenant to the land to the extent necessary for the requirements and purposes of the reservation. The complaint further alleged that the Cappaerts had no perfected water rights as of the date of the reservation. The United States asserted that pumping from certain of the Cappaerts' wells had lowered the water level in Devil's Hole, that the lower water level was threatening the survival of a unique species of fish, and that irreparable harm would follow if the pumping were not enjoined. On June 2, 1972, the United States filed an amended complaint, adding two other specified wells to the list of those to be enjoined.

The Cappaerts answered, admitting that their wells draw water from the same underlying sources supply-

---

[2] Title 28 U. S. C. § 1345 provides as follows:

"Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

ing Devil's Hole, but denying that the reservation of Devil's Hole reserved any water rights for the United States. The Cappaerts alleged that the United States was estopped from enjoining use of water under land which it had exchanged with the Cappaerts. The State of Nevada intervened on behalf of the State Engineer as a party defendant but raised no affirmative defenses.

On June 5, 1973, the District Court, by Chief Judge Roger D. Foley, entered a preliminary injunction limiting pumping from designated wells so as to return the level of Devil's Hole to not more than 3.0 feet below the marker. Detailed findings of fact were made and the District Judge then appointed a Special Master to establish specific pumping limits for the wells and to monitor the level of the water at Devil's Hole. The District Court found that the water from certain of the wells was hydrologically connected to Devil's Hole, that the Cappaerts were pumping heavily from those wells, and that that pumping had lowered the water level in Devil's Hole. The court also found that the pumping could be regulated to stabilize the water level at Devil's Hole and that neither establishing an artificial shelf nor transplanting the fish was a feasible alternative that would preserve the species. The District Court further found that if the injunction did not issue "there is grave danger that the Devil's Hole pupfish may be destroyed, resulting in irreparable injury to the United States." 375 F. Supp. 456, 460 (1974).

The District Court then held that in establishing Devil's Hole as a national monument, the President reserved appurtenant, unappropriated waters necessary to the purpose of the reservation; the purpose included preservation of the pool and the pupfish in it. The District Court also held that the federal water rights antedated those of the Cappaerts, that the United States

was not estopped, and that the public interest required granting the injunction. On April 9, 1974, the District Court entered its findings of fact and conclusions of law substantially unchanged in a final decree permanently enjoining pumping that lowers the level of the water below the 3.0-foot level. 375 F. Supp. 456 (1974).

The Court of Appeals for the Ninth Circuit affirmed, 508 F. 2d 313 (1974),[3] in a thorough opinion by Senior District Judge Gus J. Solomon, sitting by designation, holding that the implied-reservation-of-water doctrine applied to groundwater as well as to surface water. The Court of Appeals held that "[t]he fundamental purpose of the reservation of the Devil's Hole pool was to assure that the pool would not suffer changes from its condition at the time the Proclamation was issued in 1952 . . . ." *Id.*, at 318. The Court of Appeals further held that neither the Cappaerts nor their successors in interest had any water rights in 1952, nor was the United States estopped from asserting its water rights by exchanging land with the Cappaerts. In answer to contentions raised by the intervenor Nevada, the Court of Appeals held that "the United States is not bound by state water laws when it reserves land from the public domain," *id.*, at 320, and does not need to take steps to perfect its rights with the State; that the District Court had concurrent jurisdiction with the state courts to resolve this claim; and, that the state administrative procedures granting the Cappaerts' permit did not bar resolution of the United States' suit in Federal District Court.

---

[3] On appeal from the preliminary injunction, the Court of Appeals, in response to a motion from the Cappaerts to modify the injunction to permit them to pump to 3.7 feet below the copper marker, had permitted the Cappaerts to pump so long as the water level did not drop more than 3.3 feet below the marker. 483 F. 2d 432 (1973).

138

We granted certiorari to consider the scope of the implied-reservation-of-water-rights doctrine. 422 U. S. 1041 (1975). We affirm.

I

*Reserved-Water-Rights Doctrine*

This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV, § 3, which permits federal regulation of federal lands. The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams. *Colorado River Water Cons. Dist.* v. *United States,* 424 U. S. 800, 805 (1976); *United States* v. *District Court for Eagle County,* 401 U. S. 520, 522–523 (1971); *Arizona* v. *California,* 373 U. S. 546, 601 (1963); *FPC* v. *Oregon,* 349 U. S. 435 (1955); *United States* v. *Powers,* 305 U. S. 527 (1939); *Winters* v. *United States,* 207 U. S. 564 (1908).

Nevada argues that the cases establishing the doctrine of federally reserved water rights articulate an equitable doctrine calling for a balancing of competing interests. However, an examination of those cases shows they do not analyze the doctrine in terms of a balancing test. For example, in *Winters* v. *United States, supra,* the Court did not mention the use made of the water by the upstream landowners in sustaining an injunction barring

their diversions of the water. The "Statement of the Case" in *Winters* notes that the upstream users were homesteaders who had invested heavily in dams to divert the water to irrigate their land, not an unimportant interest. The Court held that when the Federal Government reserves land, by implication it reserves water rights sufficient to accomplish the purposes of the reservation.[4]

In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water. Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created. See, *e. g., Arizona* v. *California, supra,* at 599–601; *Winters* v. *United States, supra,* at 576. Both the District Court and the Court of Appeals held that the 1952 Proclamation expressed an intention to reserve unappropriated water, and we agree.[5] The

---

[4] Nevada is asking, in effect, that the Court overrule *Arizona* v. *California,* 373 U. S. 546 (1963), and *United States* v. *District Court for Eagle County,* 401 U. S. 520 (1971), to the extent that they hold that the implied-reservation doctrine applies to all federal enclaves since in so holding those cases did not balance the "competing equities." Brief for Nevada 15. However, since balancing the equities is not the test, those cases need not be disturbed.

[5] The District Court and the Court of Appeals correctly held that neither the Cappaerts nor their predecessors in interest had acquired any water rights as of 1952 when the United States' water rights vested. Part of the land now comprising the Cappaerts' ranch was patented by the United States to the Cappaerts' predecessors as early as 1890. None of the patents conveyed water rights because the Desert Land Act of 1877, 19 Stat. 377, 43 U. S. C. § 321, provided that such patents pass title only to land, not water. Patentees acquire water rights by "bona fide prior appropriation," as determined by state law. *California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U. S. 142 (1935). Under Nevada law water

Proclamation discussed the pool in Devil's Hole in four of the five preambles and recited that the "pool . . . should be given special protection." Since a pool is a body of water, the protection contemplated is meaningful only if the water remains; the water right reserved by the 1952 Proclamation was thus explicit, not implied.[6]

Also explicit in the 1952 Proclamation is the authority of the Director of the Park Service to manage the lands of Devil's Hole Monument "as provided in the act of Congress entitled 'An Act to establish a National Park Service, and for other purposes,' approved August 25, 1916 (39 Stat. 535; 16 U. S. C. 1–3) . . . ." The National Park Service Act provides that the "fundamental purpose of the said parks, monuments, and reservations" is

---

rights can be created only by appropriation for beneficial use. Nev. Rev. Stat. §§ 533.030, 534.020, 533.325 (1973). *Jones* v. *Adams,* 19 Nev. 78, 6 P. 442 (1885). Under the doctrine of prior appropriation, the first to divert and use water beneficially establishes a right to its continued use as long as the water is beneficially diverted. See *Colorado River Water Cons. Dist.* v. *United States,* 424 U. S. 800, 805 (1976). See also J. Sax, Water Law, Planning & Policy—Cases and Materials, 218–224 (1968). Neither the Cappaerts nor their predecessors in interest appropriated any water until after 1952.

Some Cappaert wells are on land acquired from the United States in 1969 through a land exchange under § 8 of the Taylor Grazing Act of 1934, 48 Stat. 1272, as amended, 43 U. S. C. § 315g (b). In this exchange the Cappaerts received land within one mile of Devil's Hole under a patent granting them "all rights, privileges, immunities and appurtenances . . . *subject to any vested and accrued water rights for mining, agriculture, manufacturing or other purposes.* . . ." (Emphasis supplied.) The federal water rights in Devil's Hole had vested 17 years before that exchange.

[6] The 1952 Proclamation forbids unauthorized persons to "appropriate, injure, destroy, or remove any feature" from the reservation. Since water is a "feature" of the reservation, the Cappaerts, by their pumping, are "appropriating" or "removing" this feature in violation of the Proclamation.

"to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 39 Stat. 535, 16 U. S. C. § 1.

The implied-reservation-of-water-rights doctrine, however, reserves only that amount of water necessary to fulfill the purpose of the reservation, no more. *Arizona* v. *California, supra,* at 600–601. Here the purpose of reserving Devil's Hole Monument is preservation of the pool. Devil's Hole was reserved "for the preservation of the unusual features of scenic, scientific, and educational interest." The Proclamation notes that the pool contains "a peculiar race of desert fish . . . which is found nowhere else in the world" and that the "pool is of . . . outstanding scientific importance . . . ." The pool need only be preserved, consistent with the intention expressed in the Proclamation, to the extent necessary to preserve its scientific interest. The fish are one of the features of scientific interest. The preamble noting the scientific interest of the pool follows the preamble describing the fish as unique; the Proclamation must be read in its entirety. Thus, as the District Court has correctly determined, the level of the pool may be permitted to drop to the extent that the drop does not impair the scientific value of the pool as the natural habitat of the species sought to be preserved. The District Court thus tailored its injunction, very appropriately, to minimal need, curtailing pumping only to the extent necessary to preserve an adequate water level at Devil's Hole, thus implementing the stated objectives of the Proclamation.

Petitioners in both cases argue that even if the intent of the 1952 Proclamation were to maintain the pool, the American Antiquities Preservation Act did not give the President authority to reserve a pool. Under that Act, according to the Cappaert petitioners, the President may

reserve federal lands only to protect archeologic sites. However, the language of the Act which authorizes the President to proclaim as national monuments "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government" is not so limited. The pool in Devil's Hole and its rare inhabitants are "objects of historic or scientific interest." See generally *Cameron* v. *United States,* 252 U. S. 450, 451–456 (1920).

## II

### *Groundwater*

No cases of this Court have applied the doctrine of implied reservation of water rights to groundwater. Nevada argues that the implied-reservation doctrine is limited to surface water. Here, however, the water in the pool is surface water. The federal water rights were being depleted because, as the evidence showed, the "[g]roundwater and surface water are physically interrelated as integral parts of the hydrologic cycle." C. Corker, Groundwater Law, Management and Administration, National Water Commission Legal Study No. 6, p. xxiv (1971). Here the Cappaerts are causing the water level in Devil's Hole to drop by their heavy pumping. See Corker, *supra;* see also Water Policies for the Future—Final Report to the President and to the Congress of the United States by the National Water Commission 233 (1973). It appears that Nevada itself may recognize the potential interrelationship between surface and ground water since Nevada applies the law of prior appropriation to both. Nev. Rev. Stat. §§ 533.010 *et seq.,* 534.020, 534.080, 534.090 (1973). See generally F. Trelease, Water Law—Resource Use and Environmental Protection 457–552 (2d ed. 1974); C. Meyers & A. Tar-

lock, Water Resource Management 553–634 (1971). Thus, since the implied-reservation-of-water-rights doctrine is based on the necessity of water for the purpose of the federal reservation, we hold that the United States can protect its water from subsequent diversion, whether the diversion is of surface or ground water.[7]

### III

### State Law

Petitioners in both cases argue that the Federal Government must perfect its implied water rights according to state law. They contend that the Desert Land Act of 1877, 19 Stat. 377, 43 U. S. C. § 321, and its predecessors[8] severed nonnavigable water from public land, subjecting it to state law. That Act, however, provides that patentees of public land acquire only title to land through the patent and must acquire water rights in nonnavigable water in accordance with state law. *Cali-*

---

[7] Petitioners in both cases argue that the effect of applying the implied-reservation doctrine to diversions of groundwater is to prohibit pumping from the entire 4,500 square miles above the aquifer that supplies water to Devil's Hole. First, it must be emphasized that the injunction limits but does not prohibit pumping. Second, the findings of fact in this case relate only to wells within 2½ miles of Devil's Hole. No proof was introduced in the District Court that pumping from the same aquifer that supplies Devil's Hole, but at a greater distance from Devil's Hole, would significantly lower the level in Devil's Hole. Nevada notes that such pumping "will in time affect the water level in Devil's Hole." Brief for Nevada 25. There was testimony from a research hydrologist that substantial pumping 40 miles away "[o]ver a period of perhaps decades [would have] a small effect." App. 79.

[8] The predecessors of the Desert Land Act of 1877 are the Act of July 26, 1866, c. 262, 14 Stat. 251, and the Act of July 9, 1870, 16 Stat. 217. Those Acts provided that water rights vested under state law or custom are protected. However, the Cappaerts did not have any vested water rights in 1952. See n. 5, *supra.*

*fornia Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U. S. 142, 162 (1935); see Morreale, Federal-State Conflicts Over Western Waters—A Decade of Attempted "Clarifying Legislation," 20 Rutgers L. Rev. 423, 432 (1966).[9] This Court held in *FPC* v. *Oregon,* 349 U. S. 435, 448 (1955), that the Desert Land Act does not apply to water rights on federally reserved land. [10]

---

[9] The cases relied upon by the Cappaerts are not to the contrary. *E. g., United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725 (1950); *Ickes* v. *Fox,* 300 U. S. 82 (1937); *Dority* v. *New Mexico ex rel. Bliss,* 341 U. S. 924 (1951). None involve a federal reservation and all involve a determination whether water rights had vested under state law. Here a federal reservation is involved and neither the Cappaerts nor their predecessors in interest had any vested water rights in 1952 when the United States' water rights vested.

*Nebraska* v. *Wyoming,* 325 U. S. 589 (1945), also relied upon by the Cappaerts, involved a federal reservation pursuant to the Reclamation Act of June 17, 1902, 32 Stat. 388, which directs the Secretary of the Interior to "proceed in conformity with [state] laws" and which provides that "the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." In *Nebraska* v. *Wyoming,* the Court noted that the United States had acted in conformity with state law. The Court said: "We intimate no opinion whether a different procedure might have been followed so as to appropriate and reserve to the United States all of these water rights. No such attempt was made." 325 U. S., at 615. Here the United States acquired reserved water rights through a reservation authorized, not by the Reclamation Act, but by the Antiquities Act.

[10] Nevada argues that the discussion of the implied-reservation doctrine in *FPC* v. *Oregon* was dictum as that case involved the supremacy of the Federal Power Act, 49 Stat. 863, 16 U. S. C. §§ 791a–825r (1952 ed., Supp. II) over state law. To the extent that the Federal Power Act authorized reservation of unappropriated water for the electrical needs of the federal project, so too did the Antiquities Act authorize implicit reservation of unappropriated water for the purposes of the Devil's Hole reservation.

The Cappaert petitioners argue that *FPC* v. *Oregon,* *supra,* must be overruled since, *inter alia,* the Court was unaware at the time that case was decided that there was no longer any public land available for homesteading. However, whether or not there was public land available for homesteading in 1955 is irrelevant to the meaning of the 1877 Act. The Desert Land Act still provides that the water rights of those who received their land from federal patents are to be governed by state law. That there may be no more federal land available for homesteading does not mean the Desert Land Act now applies to all federal land. Since the Act is inapplicable, determination of reserved water rights is not governed by state law but derives from the federal purpose of the reservation; the fact that the water rights here reserved apply to nonnavigable rather than navigable waters is thus irrelevant.

Since *FPC* v. *Oregon, supra,* was decided, several bills have been introduced in Congress to subject at least some federal water uses to state appropriation doctrines, but none has been enacted into law. The most recent bill, S. 28, 92d Cong., 1st Sess., was introduced on January 25, 1971, and reintroduced under the same number in the 93d Cong., 1st Sess., on January 4, 1973. See Morreale, *supra.*

Federal water rights are not dependent upon state law or state procedures and they need not be adjudicated only in state courts; federal courts have jurisdiction under 28 U. S. C. § 1345 to adjudicate the water rights claims of the United States.[11] *Colorado River Water Cons. Dist.* v. *United States,* 424 U. S., at 807–809. The McCarran Amendment, 66 Stat. 560, 43 U. S. C. § 666, did not repeal § 1345 jurisdiction as applied to water rights. 424 U. S., at 808–809. Nor, as Nevada suggests,

[11] See n. 2, *supra.*

is the McCarran Amendment a substantive statute, requiring the United States to "perfect its water rights in the state forum like all other land owners." Brief for Nevada 37. The McCarran Amendment waives United States sovereign immunity should the United States be joined as a party in a state-court general water rights' adjudication, *Colorado River Water Cons. Dist. v. United States, supra,* at 808, and the policy evinced by the Amendment may, in the appropriate case, require the United States to adjudicate its water rights in state forums. *Id.,* at 817–820.

## IV

### Res Judicata

Finally, Nevada, as intervenor in the Cappaerts' suit, argued in the Court of Appeals that the United States was barred by res judicata or collateral estoppel from litigating its water-rights claim in federal court. Nevada bases this conclusion on the fact that the National Park Service filed a protest to the Cappaerts' pumping permit application in the state administrative proceeding. Since we reject that contention, we need not consider whether the issue was timely and properly raised. We note only that the United States was not made a party to the state administrative proceeding;[12] nor was the United States in privity with the Cappaerts. See *Blonder-Tongue Labs., Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 320–326 (1971). When the United States appeared to protest in the state proceeding it did not assert any federal water-rights claims, nor did it seek to adjudicate any claims until the hydrological studies as to the effects of the Cappaerts' pump-

---

[12] The cases petitioners in both cases rely upon involve parties who collaterally attacked an administrative determination. Here the United States was never a party.

ing had been completed.[13]  The fact that the United States did not attempt to adjudicate its water rights in the state proceeding is not significant since the United States was not a party.  The State Water Engineer's decree explicitly stated that it was "subject to existing rights"; thus, the issue raised in the District Court was not decided in the proceedings before the State Engineer. See *Blonder-Tongue Labs., Inc.* v. *University of Illinois Foundation, supra,* at 323.  Cf. *United States* v. *Utah Constr. & Min. Co.,* 384 U. S. 394, 422 (1966).

We hold, therefore, that as of 1952 when the United States reserved Devil's Hole, it acquired by reservation water rights in unappropriated appurtenant water sufficient to maintain the level of the pool to preserve its scientific value and thereby implement Proclamation No. 2961.  Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

---

[13] The United States requested either that the permits be denied or decision postponed until the studies were completed.  While the State Engineer did not postpone decision on the permit application, the Cappaerts' attorney said that the studies "will go forward whether or not the applications are granted; so let's not make the mistake of thinking that if these applications are granted the studies are moot, they are not."  App. 307.