12 P.3d 1284 (2000)
134 Idaho 940
In re SRBA, Case No. 39576, Re: Sawtooth National Recreation Area Claims, Consolidated Subcase No. 65-20766, Encompassing Subcase Nos. 65-20766, 37-19833, 63-30428, 71-10761 and 72-46272.
STATE of Idaho and Hecla Mining Company, Appellants,
v.
UNITED STATES of America, Respondent.
Nos. 25136, 25139.
Supreme Court of Idaho, Boise, February 2000 Term.
October 27, 2000.
Hon. Alan G. Lance, Attorney General, Boise, for appellants. Peter J. Ampe, Deputy Attorney General, argued.
Hon. Betty H. Richardson, United States Attorney, Boise; United States Department of Justice Washington, DC, for respondent. Sean H. Donahue, United States Department of Justice, Washington, DC, argued.
*1286 Root & Schindler, P.C., Denver, Colorado, for appellant Hecla Mining Company. Ronald I. Schindler argued.
*1285 TROUT, Chief Justice.
This is an appeal by the State of Idaho and Hecla Mining Company (Hecla) from a Snake River Basin Adjudication district court judgment involving federal reserved water rights in the Sawtooth National Recreation Area (Sawtooth NRA), which includes the Sawtooth Wilderness Area.

I.

FACTUAL AND PROCEDURAL BACKGROUND
In 1972, Congress passed legislation establishing the Sawtooth NRA "to assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and provide for the enhancement of the recreational values associated therewith." Pub.L. No. 92-400 §§ 1-15, 86 Stat. 612, (codified at 16 U.S.C. §§ 460aa et seq.). Prior to its adoption, the Act was intended to create two entirely separate land units, a wilderness area and a recreation area. In its final form, however, the Act established one large land reservation consisting of a wilderness section and non-wilderness section.
The non-wilderness portions of the Sawtooth NRA were created primarily from existing federal lands and the Act provides they are to be administered in such a manner as will best provide for (1) the protection and conservation of fisheries; (2) the conservation and development of scenic, natural, historic, pastoral, wildlife and other values contributing to, and available for, public recreation and enjoyment; and (3) the management, utilization, and disposal of natural resources on federally owned lands. See Sawtooth National Recreation Area Act § 2(a), 16 U.S.C. § 460aa-1(a). Additionally, the wilderness portion of the Sawtooth NRA, designated as the Sawtooth Wilderness Area, is to be administered in accordance with the provisions of the Act and the Wilderness Act, 16 U.S.C. § 1131, et. seq., whichever is more restrictive. See Sawtooth National Recreation Area Act § 2(b), 16 U.S.C. § 460aa-1(b).
In 1997, the United States filed a claim in the SRBA district court pursuant to I.C. § 42-1411A, seeking a federal reserved water right to the entire unappropriated flow of the waters within the Sawtooth NRA. The SRBA district judge granted a motion by the United States to amend its claim to "the entire unappropriated flow of all natural water sources as of the date of designation, specifically, August 22, 1972, except for water necessary to fulfill existing and future uses as contemplated by the Act." The State and Hecla filed objections to the federal claim.
After considering cross-motions for summary judgment on whether the Act provided a basis for implying a federal reserved water right, the district judge issued an order in September, 1998, granting in part and denying in part the United States' motion for summary judgment. The Order granted the United States an implied federal reserved water right for the entire Sawtooth NRA, including the Wilderness Area. The district judge held the implied water right consisted of all unappropriated flows for the Wilderness Area with a priority date of 1972, as well as all water necessary to fulfill the purposes of the Act with regard to the non-wilderness portions of the Sawtooth NRA. The district judge then found a genuine issue of material fact remained regarding the minimum amount of water necessary to fulfill the purposes of the Act with regard to the non-wilderness area and denied the United States' motion for summary judgment as to the quantity of water for that claim. The State and Hecla appealed.

II.

STANDARD OF REVIEW
When reviewing a trial court's ruling on a summary judgment motion, we employ "the same standard properly employed by the district court when originally ruling on the motion." Lamb v. Manweiler, 129 Idaho 269, 271, 923 P.2d 976, 978 (1996). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a *1287 matter of law." I.R.C.P. 56(c). In applying this standard, we liberally construe the record in favor of the non-moving party, and will draw all reasonable inferences and conclusions supported by the record in favor of the party opposing the motion. McKay v. Owens, 130 Idaho 148, 152, 937 P.2d 1222, 1226 (1997). This appeal does not involve factual disputes. Whether the Sawtooth National Recreation Area Act establishes a federal reserved water right is purely a question of law. See, e.g., United States v. City of Challis, 133 Idaho 525, 529, 988 P.2d 1199, 1203 (1999).

III.

DISCUSSION

A. The Sawtooth National Recreation Area Act does not provide a basis for federal reserved water rights.
In United States v. State of Idaho, 131 Idaho 468, 959 P.2d 449 (1998), we noted that the federal reserved water rights doctrine arises from the United States Supreme Court decision in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). In Winters, the Supreme Court held that when Congress created an Indian reservation, it also, by implication, reserved the water necessary to achieve the purposes of the reservation. Since the Winters decision, the doctrine has been extended "to include public lands reserved for a particular governmental purpose, such as the creation of parks, wildlife refuges, and national forests." State of Idaho, 131 Idaho at p. 470, 959 P.2d 449.
A federal reserved water right arises only from a reservation of land and may be either express or implied. United States v. New Mexico, 438 U.S. 696, 699-700, 98 S.Ct. 3012, 3013-14, 57 L.Ed.2d 1052, 1056-57 (1978). Thus, in order to determine whether the Sawtooth National Recreation Area Act provides a basis for federal reserved water rights, we "must assess (1) whether there has been a reservation of land, and, if so (2) whether the applicable acts of Congress contain an express reservation of water, and (3) if not, whether the applicable acts imply a reservation of water." City of Challis, 133 Idaho at 529-30, 988 P.2d at 1203-04 (1999). In deciding whether an implied reservation of water exists, we must determine whether Congress "intended to reserve" unappropriated waters. Cappaert v. United States, 426 U.S. 128, 139, 96 S.Ct. 2062, 2070, 48 L.Ed.2d 523, 534 (1976). An intent to reserve water is inferred if water is necessary for the primary purposes of the reservation and if, without water, the purposes of the reservation will be entirely defeated. New Mexico, 438 U.S. at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1057. If, however, the water is only necessary for a secondary purpose of the reservation, the United States is left to "acquire water in the same manner as any other public or private appropriator." Id. at 702, 98 S.Ct. at 3015, 57 L.Ed.2d at 1058.

1. Reservation of land.

The State and Hecla argue the federal reserved water rights doctrine should not apply to this case because the Act did not reserve land as is required by the doctrine. They argue that because the Act does not use the word "reservation," and because most of the land in the Sawtooth NRA had previously been reserved for national forest purposes at the time the Sawtooth NRA was created, the Act did not create a reservation of land. Additionally, the State and Hecla argue the Act did not "re-reserve" those lands previously reserved as national forest lands. We do not find it necessary to address this element of the test for determining whether a federal reserved water right is present in this case. Even assuming, arguendo, the Act made such a reservation, the other two elements are not met and thus the assertion of a reserved water right must fail.

2. Express reservation.

It is undisputed the Act does not make an express reservation of water. However, the State and Hecla argue the Act expressly addresses a denial of federal reserved water rights. Specifically, the State and Hecla argue Section 9 of the Act expressly disclaims a federal reservation of water within the Sawtooth NRA. Section 9 of the Act states:
The jurisdiction of the State and United States over waters of any stream included in the recreation area shall be determined by established principles of law. Under *1288 the provisions of this Act, any taking by the United States of a water right which is vested under either State or Federal law at the time of enactment of this Act shall entitle the owner thereof to just compensation. Nothing in this Act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

Sawtooth National Recreation Area Act § 9, 16 U.S.C. § 460aa-8 (emphasis added).
In another case involving federal reserved water rights issued by this Court today, Potlatch Corporation v. United States, 134 Idaho 916, 12 P.3d 1260 (2000), we held the "no claim or denial" language, as used in congressional legislation designating federal lands for particular federal purposes, "neither establishes a federal water right nor precludes the recognition of such a right if water is otherwise reserved." Id. at 922, 12 P.3d at 1266. Thus, we hold the Act did not create an express federal reservation of water, nor did it expressly disclaim federal reserved water rights in the Sawtooth NRA.

3. Implied reservation.

In deciding whether an implied reservation exists, we must determine whether Congress "intended to reserve" unappropriated waters. Cappaert, 426 U.S. at 139, 96 S.Ct. at 2070, 48 L.Ed.2d at 534; United States v. City of Challis, 133 Idaho 525, 530, 988 P.2d 1199, 1204 (1999). Intent to reserve unappropriated water is inferred if the water is necessary to accomplish the primary, rather than secondary, purposes of the reservation. Additionally, the need for the water must be so great that, without the water, the purposes of the reservation will be entirely defeated. Cappaert, 426 U.S. at 139, 96 S.Ct. at 2070, 48 L.Ed.2d at 534, City of Challis, 133 Idaho at 530, 988 P.2d at 1204 (citing New Mexico, 438 U.S. at 700-02, 98 S.Ct. at 3014-15, 57 L.Ed.2d at 1057-58). Thus, our inquiry begins with a determination of the primary purpose of the reservation, and then turns to whether the previously unappropriated water is necessary to achieve that purpose because, without the water, the purpose of the reservation would be entirely defeated.

a. The primary purpose of the Act is to protect the Sawtooth NRA from the dangers of unregulated development and mining operations.

A determination of the primary purpose of the Sawtooth NRA Act is a question of statutory interpretation. Interpretation of a statute must begin with the plain meaning of its language. If the statutory language is clear and unambiguous, the Court need merely apply the statute without engaging in any statutory interpretation. State v. Hagerman Water Right Owners, Inc., 130 Idaho 727, 732, 947 P.2d 400, 405 (1997); State v. McCoy, 128 Idaho 362, 365, 913 P.2d 578, 581 (1996). However, if it is necessary for the Court to interpret a statute, then it will attempt to ascertain legislative intent by examining the language used, the reasonableness of proposed interpretations, and the policy behind the statute. Hagerman, 130 Idaho at 732, 947 P.2d at 405.
In this case, the primary purpose of the Act is clear from the plain language of the statute itself. Section 1 of the Act states "in order to assure the preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith, the Sawtooth National Recreation Area is hereby established." Sawtooth National Recreation Area Act § 1(a), 16 U.S.C. § 460aa(a). The Act then divides the Sawtooth NRA into two sections; a wilderness portion and a non-wilderness portion. With regard to the non-wilderness portion, Section 2 then instructs the Secretary of Agriculture to:
administer the recreation area in accordance with the laws, rules and regulations applicable to the national forests in such manner as will best provide (1) the protection and conservation of the salmon and other fisheries; (2) the conservation and development of scenic, natural, historic, pastoral, wildlife, and other values, contributing to and available for public recreation and enjoyment, including the preservation of sites associated with and typifying the economic and social history of the American West; and (3) the management, utilization, and disposal of natural resources *1289 on federally owned lands such as timber, grazing, and mineral resources insofar as their utilization will not substantially impair the purposes for which this recreation area is established.
Sawtooth National Recreation Area Act § 2(a), 16 U.S.C. § 460aa-1(a). The wilderness portion of the recreation area is to be administered in accordance with the provisions of the Sawtooth NRA Act and the provisions of the Wilderness Act, whichever is more restrictive. Sawtooth NRA Act § 2(b), 16 U.S.C. § 460aa-1(b). The Act then authorizes the Secretary to acquire lands by purchase, donation, exchange, and, in certain cases, condemnation proceedings. Sawtooth National Recreation Area Act § 3, 16 U.S.C. § 460aa-2. Additionally, the Act requires the Secretary to develop "regulations setting standards for the use, subdivision, and development of privately owned property within the boundaries of the recreation area." Sawtooth NRA Act § 4(a), 16 U.S.C. § 460aa-3(a). Finally, Section 12 prohibits the issuance of any future patents for mining claims in the Sawtooth NRA.
From the provisions of the Act, it is clear the primary purpose of the Act is to regulate development and mining in the non-wilderness portions of the Sawtooth NRA in order to preserve and protect the natural, scenic, historic, pastoral, and fish and wildlife values of the area, as well as to enhance the recreational values associated with the area. As to the wilderness portion of the Sawtooth NRA, the Act contemplates an even stricter limit on development by providing for the administration of the wilderness portion of the Sawtooth NRA in a manner consistent with the provisions of the Wilderness Act. However, in order to protect the wilderness portion of the Sawtooth NRA from mining operations, an activity allowed by the Wilderness Act, the wilderness portion of the Sawtooth NRA was made a part of the entire recreation area, rather than a separate wilderness area. See 118 CONG. REC. H28106-7 (Aug. 14, 1972) (statement of Rep. Aspinall). Thus, a review of the entire legislation reveals the primary purpose of the Act was to protect the Sawtooth NRA from the dangers of unrestricted development and mining operations.
This conclusion is supported by the legislative history of the Act. For example, a 1967 Senate Report states "the purpose of the legislation is not to eliminate private holdings, but rather to prevent unsightly subdivision of the valley which would destroy the future public enjoyment. The bill for this reason ... contains a scenic easement power which will enable the Secretary to implement reasonable zoning regulations for these private lands." S.REP. No. 730, at 2 (1967). Similarly, a 1971 House Report also emphasizes the danger posed by unregulated development. The report states:
One of the potential threats to the recreation objective is the prospect of the subdivision of the presently privately owned, undeveloped lands which form the foreground of the mountain setting. While practically no one objects to broad open pasture lands with an occasional ranchhouse and associated outbuildings, the intensive development of summer cottage subdivisions on lots as small as one-eighth of an acre would severely detract from the setting which [the Act] seeks to preserve....
H.R.REP. No. 92-762, at 8 (1971).
Thus, we hold that when the purposes set forth in section 1 are read in conjunction with the manner in which the lands are to be administered, as well as the legislative history of the Act, it becomes evident the purpose of the Act was to protect the wilderness portion of the Sawtooth NRA from mining operations, and to protect the non-wilderness portion of the Sawtooth NRA from the dangers of unregulated development and mining in order to preserve and protect the natural, scenic, historic, pastoral, and other values associated with those areas.

b. Water is not necessary to fulfill the primary purposes of the non-wilderness portion of the Sawtooth NRA.

In its opinion and order below, the district court ruled the United States is entitled to a federal reserved water right for the non-wilderness portion of the Sawtooth NRA, but required further quantification of the right. In so holding, the district court first determined the primary purpose of the Act is "the *1290 preservation and protection of the natural, scenic, historic, pastoral, and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith." The district court then took judicial notice of the fact that fish require water to live, and because Section 1 of the Act mentions the protection of fish and wildlife values, ruled water was necessary to fulfill the primary purpose of the Act. While we agree fish require water, we do not agree judicial notice of this fact establishes that without such water the purposes of the non-wilderness portion of the Sawtooth NRA will be entirely defeated.
In order to meet the test of necessity required for a federal reserved water right, the need for water must be so great that, without water, the primary purpose of the reservation will be entirely defeated. New Mexico, 438 U.S. at 700, 98 S.Ct. at 3014, 57 L.Ed.2d at 1057. In this case, we do not believe the non-wilderness portion of the reservation created by the Sawtooth National Recreation Area Act meets this test. As previously discussed, the primary purpose of the non-wilderness portion of the Act was to protect that area from the dangers of unregulated development and mining operations in order to preserve the natural, scenic, historic, pastoral, and fish and wildlife values and enhance the recreational values associated with the area. These purposes are, and have been, accomplished through the promulgation of land use regulations for the recreation area which control the rate and manner of development of the area, as well as limiting mining operations. See, e.g., 36 C.F.R. §§ 292.14-292.18 (1999). Contrary to the assertions of the United States, the purpose of the Act was not simply to protect fish habitat, but rather to protect that habitat, as well as the other values associated with the recreation area, from the dangers associated with unregulated mining operations. See H.R.REP. No. 92-762, at 13 (1971). Because those dangers are now addressed by government regulations, it is clear the purposes of the reservation will not be entirely defeated without water. Thus, we hold the Act does not imply a federal reserved water right for the non-wilderness portions of the Sawtooth NRA.

c. Water is not necessary to fulfill the primary purposes of the wilderness portion of the Sawtooth NRA.

The district court ruled the purpose of the wilderness portion of the Sawtooth NRA would be entirely defeated without water, and all unappropriated flows were necessary to fulfill the purposes of the reservation. The district judge based this decision on his prior conclusion that wilderness areas created pursuant to the Wilderness Act contain implied federal reserved water rights for all unappropriated flows as of the effective date of the reservation. However, as we have held today, the Wilderness Act does not contain an implied federal water right. See Potlatch Corporation, 134 Idaho at 922, 12 P.3d at 1266. We find nothing in the provisions of the Act relating to the wilderness portion of the Sawtooth NRA which leads to any different conclusion in this case.
As with the non-wilderness portion, the United States argues because Section 1 of the Act mentions protecting fish and wildlife values, and fish require water, water is necessary to fulfill the purposes of the reservation. This argument, however, ignores the intent behind the legislation creating the wilderness portion of the Sawtooth NRA. As the House Report states:
In the vicinity of Castle Peak, in the striking and spectacular White Clouds, there has been a dramatic increase in activity relating to exploration and possible development of molybdenum deposits which have been found there. Adequate safeguards are needed to assure that this activity will not impair the visual grandeur of the area, adversely affect fish and wildlife resources, and cause pollution of downstream waters.
The extensive annual migration of salmon and steelhead trout to the upper reaches of the Salmon River is a significant biological feature and an important recreation and economic resource. Its continuation is dependent, in part at least, on preservation of the spawning grounds .... Preservation of the spawning grounds from destruction from dredging, stream *1291 alteration, silt deposits, or pollution is essential.

H.R.REP. No. 92-762, at 13 (1971). Thus, it is apparent the Act was intended to protect fish and habitat from damage caused by mining operations within the wilderness area. This protection is afforded by the existence of statutes and regulations governing mining operations in the Sawtooth National Recreation Area. From this legislative history, it is clear that despite the fact the Act mentions the protection of fish habitat, a federal reserved water right is not necessary for the type of protection contemplated by the Act. Additionally, while the Sawtooth Wilderness Area was included within the Sawtooth NRA in order to provide greater protection than was afforded by the Wilderness Act, this protection does not require an implied federal reserved water right. The primary purpose of the wilderness portion of the Sawtooth NRA was to protect that area from the dangers of mining. This purpose can be fulfilled through the application of land use regulations and, without water, the purposes of the wilderness portion of the Sawtooth NRA will not be entirely defeated. Thus, we hold the Sawtooth National Recreation Area Act does not contain an implied federal reserved water right for either the wilderness portion or the non-wilderness portion of the recreation area.

IV.

CONCLUSION
Based on the foregoing discussion, we hold (1) Congress did not expressly claim or disclaim federal water rights in the lands designated by the Act; (2) the primary purpose of the Sawtooth NRA is to protect the non-wilderness portion from the dangers of unregulated development and mining, and to protect the wilderness portion from mining operations which would have been allowed under the Wilderness Act; and (3) the intent to reserve water in both the wilderness and non-wilderness portions of the Sawtooth NRA cannot be implied because, without water, the primary purposes of the reservations will not be entirely defeated. Thus, we reverse the order of the district court and remand this case for further proceedings consistent with this opinion. No attorney fees are awarded on this appeal. We award costs to appellants.
Justices SCHROEDER, WALTERS and KIDWELL concur.
Justice SILAK dissenting.
I respectfully dissent from the majority opinion for the reasons stated below.
The Sawtooth National Recreation Area (SNRA) Act comprises two areas: the wilderness section and non-wilderness section. Regarding the non-wilderness section, or so-called "recreation area" of the SNRA, the plain language of the SNRA Act states that the purpose of this area is to "assure the preservation and protection of the natural, scenic, historic, pastoral and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith ...." 16 U.S.C. § 460 aa(a). This section is to be read in conjunction with § 1(a) of the Act, which states:
The Secretary shall administer the recreation area in accordance with the laws, rules and regulations applicable to the national forests in such manner as will best provide (1) the protection and conservation of the salmon and other fisheries; (2) the conservation and development of scenic, natural historic, pastoral, wildlife, and other values, contributing to and available for public recreation and enjoyment, including the preservation of sites associated with and typifying the economic and social history of the American West; and (3) the management, utilization, and disposal of natural resources on federally owned lands such as timber, grazing, and mineral resources insofar as their utilization will not substantially impair the purposes for which the recreation area is established.
16 U.S.C. § 460 aa-1(a).
The express statement of purpose in the very words of the SNRA Act is sufficient to determine Congress's primary purpose for establishing the SNRA. Additionally, the legislative history reaffirms what Congress expressly stated in the statutory language. The legislative history is voluminous, but statements regarding the goals of the proposed legislation show that the preservation *1292 of a unique environment was Congress's primary focus in promulgating the SNRA Act. The House Report states that "the acknowledged objective of the Congress is to assure the preservation and protection of the natural, scenic, historic, pastoral and fish and wildlife values and to provide for the enhancement of the recreational values associated with them." H.R.Rep. No. 92-762 at 9 (1971); Sawtooth National Recreation Area, Idaho: Hearings on S. 1407 and H.R. 6957 Before the Senate Subcomm. on Parks and Recreation of the Comm. on Interior and Insular Affairs, 92d Congress at 44 (April 12 and 13, 1972) (hereinafter referred to as "1972 Senate Hearing"). Senator Frank Church of Idaho stated, "the purpose of this legislation is to protect the scenic values and recreational values and give them a priority that they don't have under ordinary law." 1972 Senate Hearings at 65. The legislative history also emphasizes Congress's desire to give "national recognition" to the Sawtooth "scenic and recreational values," S.R. No. 92-797 at 3 (1972), U.S.Code Cong. & Admin.News 1972 at 702, 702-703; to protect the fisheries and the "numerous lakes, streams and rivers" within the SNRA that provide habitat for fish, id. at 4, U.S.Code Cong. & Admin.News 1972 at 703; and to safeguard the "180 gem-like lakes," "several hundred miles of rushing streams," and scenic views that draw visitors to the area, H.R.Rep. No. 92-762 at 5; 1972 Senate Hearings at 40.
The enumerated purposes of preservation and protection of natural scenic and recreational values, including salmon and other fisheries, lead me to the conclusion that these primary purposes of the recreation area would be entirely defeated without water. Thus, I would conclude under the Winters doctrine that a federal water right is also implied by the Act in the non-wilderness section of the SNRA.
I disagree with the majority opinion's conclusion that the primary purpose of the Act is to prevent subdivisions and restrict mining. To say that the SNRA's primary purpose is to enact these restrictions is to ignore the express legislative language concerning preservation and protection of natural, scenic and recreational values, as well as the legislative history. If Congress had been primarily concerned with only subdivisions on the private lands and mining on federal lands, it could have enacted a statute limited to these matters.
Further, there is no inconsistency between the specific legislative concerns to regulate subdivisions and mining, and the broader legislative purposes set forth in the statute and quoted above. Congress's desire to limit the development of private land located within the SNRA boundaries, and to bar new mining claims, is a means of achieving the preservation of the entire area's natural, scenic, and recreational values that the Act itself cites in § 1(a). The reason that Congress was concerned about subdivisions and mining is that it feared these were threats to the natural, scenic, and recreational values of the area. The Senate Report, for example, referred to the prospect of subdivisions as "one of the potential threats" to the objective of "general public outdoor recreation," and to the possible development of a molybdenum mine at White Cloud Peaks as another possible threat to the recreation objective. S.Rep. No. 92-797 at 4-5, U.S.Code Cong. & Admin.News 1972 at 702, 704.
The majority's analysis of the primary purpose of the SNRA Act is flawed, for without support in either the Act itself or in the legislative history it confuses the means for the end: the "means" of preservation is regulating subdivisions and mining. The "end" is to "assure the preservation and protection of the natural, scenic, historic, pastoral and fish and wildlife values and to provide for the enhancement of the recreational values associated therewith ..." 16 U.S.C. § 460aa(a). This is the primary purpose of the Act and it cannot be achieved, under the Winters doctrine, without water. As the district court correctly noted, protection of fish habitat is impossible without the presence of the water in which the fish live.
Regarding the wilderness portion of the SNRA, as stated in my dissent in the companion appeal of Potlatch, et al. v. United States, 134 Idaho 916, 12 P.3d 1260 (2000), wilderness areas are established for the primary purpose of preserving the wilderness character of reserved areas. The proper application of the Winters doctrine dictates that an implied federal reserved water right be *1293 granted for the portion of the SNRA that is designated a wilderness area.
Therefore, I would affirm the district court's decision that a federal water right for the SNRA is implied under the Winters doctrine in both the recreation and wilderness areas, and I would remand to the district court for a determination of the amount necessary to fulfill the purposes of the SNRA Act for the non-wilderness area.