**PARK CENTER WATER DISTRICT,**
Objector–Appellant,

v.

**UNITED STATES of America,**
Applicant–Appellee,

and

**State of Colorado, Objector–Appellee,**

and

**Division Engineer, Water Division No. 2, Appellee.**

No. 88SA199.

Supreme Court of Colorado,
En Banc.

Oct. 23, 1989.

Vranesh and Raisch, Eugene J. Riordan and Brian M. Nazarenus, Boulder, for objector-appellant.

Michael J. Norton, U.S. Atty., Robert J. Marzulla, Asst. Atty. Gen., and John R. Hill, Jr., Atty., Dept. of Justice, Denver, and Dirk D. Snel and Robert L. Klarquist, Attys., Appellate Section Land & Natural Resources Div., Dept. of Justice, Washington, D.C., for applicant-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Carol D. Angel, Asst. Atty. Gen., Natural Resources Section, Denver, for objector-appellee and appellee.

Justice ERICKSON delivered the Opinion of the Court.

This is an appeal[1] from a decision of the District Court, Water Division 2[2] (water court), awarding the United States a reserved water right to the entire flow of water from the Park Center well (the well), with a priority date of May 29, 1936. Appellant Park Center Water District (Park Center) objected to the United States application on the basis of a decree entered by the water court in April 1973. The water court held that the United States was not bound by the 1973 decree, and that Park Center was collaterally estopped from contesting the application of the United States by virtue of the decision of the Interior Board of Land Appeals (IBLA) in 1977 involving Park Center and the United States. Alternatively, the water court found that Park Center was estopped by contract from objecting to the reserved water rights of the United States because of a series of leases between the parties concerning the well. Finally, the water court ruled that the United States had reserved the entire output of the well under the federal reservation of water rights doctrine, and that the reservation antedated any right to the water held by Park Center. Park Center appealed. We affirm.

## I.

The essential facts are not in dispute. The Park Center well is located in the watershed of Fourmile Creek, a tributary of the Arkansas River, in Fremont County. The well was originally drilled by the Mutual Oil and Development Company as an exploratory oil and gas well on public land

---

1. *See* Colo. Const. art. VI, § 2(2); § 13–4–102(1)(d), 6A C.R.S. (1987); C.A.R. 1(a)(2).

2. Water Division 2 "consists of all lands in the state of Colorado in the drainage basins of the Arkansas river and the Dry Cimarron river, and streams tributary to said rivers." § 37–92–201(1)(b), 15 C.R.S. (1973).

in the 1920s, under the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181–193 (1982). The well never struck oil or gas, but it did intercept water under artesian pressure.

Before the well was plugged, the Mineral Leasing Act was amended by the Oil and Gas Conversion Act of 1934 (Conversion Act), 48 Stat. 977, 30 U.S.C. 229a (amended 1976).[3]

The well was completed as a water-producing well to a depth of 3,216 feet. On September 27, 1934, a forty acre legal subdivision containing the well was withdrawn from the public domain pursuant to Executive Order of Withdrawal dated April 17, 1926 (also known as Public Water Reserve No. 107). The authority for the executive order was section 10 of the Stock Raising Homestead Act, 43 U.S.C. § 300 (repealed 1976). *See United States v. City & County of Denver*, 656 P.2d 1, 31 n. 47 (Colo. 1982) [hereinafter *Denver I* ].

In June 1935, the artesian water flow from the well was measured at 2.67 cubic feet per second (cfs). The casing of the well was purchased by the United States in 1936 under the provisions of the Conversion Act. Since 1937, Park Center and its predecessor, Canyon Heights Irrigation and Reservoir Company (Canyon Heights), have used the water from the well under a series of leases with the United States.[4] Each such lease, including the current twenty-year lease which commenced in 1971, has stated, "The furnishing of water hereunder shall under no circumstances become the basis of a permanent water right."

## II.

Park Center and Canyon Heights filed an application in 1972 in the water court for a water right to the water from the Park Center well. *See* § 37–92–302, 15 C.R.S. (1973). In 1973, the water court awarded Park Center a water right for 708 gallons per minute (1.58 cfs) for domestic and irrigation purposes, with a priority date of

---

**3.** The Conversion Act, ch. 557, 48 Stat. 977 (1934) (amended 1976) provided in relevant part:

(a) All prospecting permits and leases for oil or gas made or issued under the provisions of this [Mineral Lands Leasing] Act [of 1920] shall be subject to the condition that in case the permittee or lessee strikes water while drilling instead of oil or gas, the Secretary of the Interior may, when such water is of such quality and quantity as to be valuable and usable at a reasonable cost for agricultural, domestic, or other purposes, purchase the casing in the well at the reasonable value thereof to be fixed under rules and regulations to be prescribed by the Secretary: *Provided,* That the land on which such well is situated shall be reserved as a water hole under section 10 of the Act of December 29, 1916.

(b) In cases where water wells producing such water have heretofore been or may hereafter be drilled upon lands embraced in any prospecting permit or lease heretofore issued under the Act of February 25, 1920, as amended, the Secretary may in like manner purchase the casing in such wells.

(c) The Secretary may make such purchase and may lease or operate such wells for the purpose of producing water and of using the same on the public lands or of disposing of such water for beneficial use on other lands, and where such wells have heretofore been plugged or abandoned or where such wells have been drilled prior to the issuance of any permit or lease by persons not in privity with

the permittee or lessee, the Secretary may develop the same for the purposes of this section: *Provided,* That owners or occupants of lands adjacent to those upon which such water wells may be developed shall have a preference right to make beneficial use of such water.

(d) The Secretary may use so much of any funds available for the plugging of wells, as he may find necessary to start the program provided for by this section, and thereafter he may use the proceeds from the sale or other disposition of such water as a revolving fund for the continuation of such program, and such proceeds are hereby appropriated for such purpose.

The Conversion Act was amended in 1976 by Pub.L. 94–579, 90 Stat. 2792 (1976). The amendment struck out the final proviso of subsection (a) relating to the reservation of the land "as a water hole under section 10 of the Act of December 29, 1916." Section 10 of the Act of December 29, 1916, was section 10 of the Stock Raising Homestead Act, 43 U.S.C. § 300 (repealed 1976).

**4.** The water court found that the water from the well has never been beneficially used by anyone other than Park Center or Canyon Heights. From 1937 to 1968, water from the well was used for irrigation. In 1969, the water was used for both irrigation and domestic purposes, serving about 100 households. Presently, the water is used exclusively by Park Center for domestic purposes, serving 753 households.

January 8, 1938. The United States was not joined as a party, and did not object to the application or award.

In a separate proceeding in 1976, Park Center and Canyon Heights appealed to the IBLA from an adverse decision of the Colorado State Office of the Bureau of Land Management (BLM). The decision awarded the United States an increase under the lease from two cents per thousand gallons of water used by Park Center from the well, to six cents.[5] The IBLA affirmed the decision of the BLM. *Park Center Water Dist. & Canyon Heights Irrigation & Reservoir Co.*, 84 Interior Dec. 87 (1979). The opinion stated that "[the Park Center] well and its water are withdrawn from any other disposition, including the attempted disposition under state law.... Finally, [Park Center and Canyon Heights] are estopped by contract from asserting any sort of permanent water right against the United States." *Id.* at 91.[6]

The United States was joined in May 1979 as a party in Case No. 79CW176 in Water Division 2, pursuant to the McCarran Amendment.[7] It filed a general application for federal reserved water rights, and state appropriative water rights, in December 1979, claiming, *inter alia:*

> the entire flow of wells drilled pursuant to oil and gas prospecting permits or leases which produce water and which have been determined to be valuable for water production by the Secretary of the Interior, purchased pursuant to 30 USC 229, and the land subdivision containing the well withdrawn and reserved for public use.

The sources of this claim were described as "all springs, wells, waterholes and other bodies of water located within the boundaries of this Water Division which are needed or used by the public for watering purposes and which are located on the lands described in the applicable reserving documents."

The application addressed section 37–92–306, 15 C.R.S. (1973),[8] and stated that the

---

**5.** In its statement for reasons of appeal, Park Center raised the following grounds, *inter alia:*

1. That said decision is arbitrary and capricious in that such increase in water rates is unrelated to any defined or ascertainable standard of value and, further, constitutes an unreasonable and unjustifiable increase based upon the *reasonable value and prices for untreated water paid by other water users in the State of Colorado and, more particularly, in Fremont County, Colorado, which is where the water well in question is located.*

. . . .

7. That under a recent United States Supreme Court case, namely *Akins vs. The United States and the Colorado River Water Conservation District,* it has been determined that waters located upon Federal lands are subject to the laws of the several states in which they are located and to the jurisdiction of the courts of such states to determine water rights thereon and that pursuant to Colorado law [Park Center and Canyon Heights] have heretofore applied for and obtained an under ground water right for the water available from said water well and that therefore [Park Center and Canyon Heights] are entitled to the continued use of the water available from said water well and the *Bureau of Land Management is, by law, barred from the right to increase or impose additional water rates for the use of said water by [Park Center and Canyon Heights].*

(Emphasis added.) Nevertheless, Park Center maintained in the water court, and it renewed the argument before this court, that the lease between Park Center and the United States was for access to the well only, and not for the use of water. In addition, Park Center claims that the issue of the right to the water from the well was not before the IBLA.

**6.** Park Center did not seek judicial review of the IBLA decision, although it could have, *Shell Oil Co. v. Kleppe,* 426 F.Supp. 894, 897 (D.Colo. 1977), *aff'd sub. nom. Shell Oil Co. v. Andrus,* 591 F.2d 597 (10th Cir.1979), *aff'd,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). The decision is now final and no longer subject to judicial review. *See Heritage Pullman Bank & Trust Co. v. United States,* 480 F.Supp. 54, 57 (N.D.Ill.1979).

**7.** 43 U.S.C. § 666 (1982). "The McCarran Amendment waives United States sovereign immunity should the United States be joined as a party in a state-court general water rights' adjudication, . . . ." *Cappaert v. United States,* 426 U.S. 128, 146, 96 S.Ct. 2062, 2073, 48 L.Ed.2d 523 (1976).

**8.** Section 37–92–306 provides, in part:

**Priorities junior to prior awards—when.** With respect to each division described in section 37–92–201, the priority date awarded for water rights or conditional water rights adjudged and decreed on applications for a determination of the amount and priority thereof filed in such division during each cal-

United States was filing the general application in the same year in which it had first been joined in a general water rights adjudication in Water Division 2, in order to preserve the right to antedation.[9] The 1979 application also purported to reserve the right of the United States to amend the application "for specific water rights of the United States which are described generally in paragraph 5, above, and will be filed by agency [sic] as the applications are completed."

The United States claimed that the reason for delay in filing specific applications was the large number of water rights involved, and a lack of time and manpower. In December 1980, the water court entered an order for the assignment of new case numbers for the subsequent specific applications of the United States. The water court ruled in September 1981, however, in Case No. 79CW176, that "[i]n the interest of fairness," and because of the "very complicated" nature of the case, it had permitted the procedure whereby the United States had amended the 1979 application by more specific filings. Subsequently, in October 1981, the water court held that the applications filed by the United States in the renumbered cases would be considered

amendments to the original general application filed in 1979, and that these amendments would relate back to the time of the filing of that first application.[10]

Finally, on November 29, 1981 (within the March 31, 1982 cutoff date for amendments imposed by the water court), the United States filed the application which specifically claimed federal reserved rights in the Park Center well, for 2.67 cfs of water, with a priority date of May 29, 1936. Various parties, including Park Center, filed objections to the application of the United States for reserved water rights in the well.

By decision dated May 7, 1988, the water court awarded the United States a right to the water from the Park Center well. It rejected Park Center's claim that the United States was bound by the 1973 decree obtained by Park Center without the joinder of the United States.[11] Instead, the water court held that Park Center was collaterally estopped from contesting the reserved water rights of the United States in the well because of the unappealed IBLA decision. In addition, the water court found, on the merits, that the United States

---

endar year shall establish the relative priority among other water rights or conditional water rights awarded on such applications filed in that calendar year; *but such water rights or conditional water rights shall be junior to all water rights or conditional water rights awarded on such applications filed in any previous calendar year....* (Emphasis added.)

**9.** "Antedation" allows the award of an earlier priority date than the postponement doctrine would permit. *United States v. Bell,* 724 P.2d 631, 635 n. 6 (Colo.1986). Under the postponement doctrine, the date of appropriation determines the relative priorities among applicants for water rights within a calendar year. The priorities of all water rights decreed within a calendar year, however, are junior to the priorities of water rights decreed in earlier calendar years. § 37–92–306; *Bell,* 724 P.2d at 641–42. "Priority" is defined as

the seniority by date as of which a water right is entitled to use or conditional water right will be entitled to use and the relative seniority of a water right or a conditional water right in relation to other water rights and conditional water rights deriving their supply from a common source.

Section 37–92–103(10), 15 C.R.S. (1973). In this case, the United States would be eligible for antedation only because it was privileged from joinder in earlier years prior to the McCarran Amendment. *Bell,* 724 P.2d at 642. Once properly joined, the United States may obtain a decree for a water right with an earlier date than the postponement doctrine would otherwise allow. *Id.* If, however, the United States does not seek an adjudication of a specific water right within the calendar year in which it is first properly joined, the United States is subject to the postponement doctrine. *Id.* at 645.

**10.** The water court found that the subsequent applications were merely amendments to the original application, so that the court had the authority to allow them to relate back to the 1979 application. In addition, the water court concluded that it had "the inherent power to adjust procedures to fit this unique case and its amendments."

**11.** On this appeal, Park Center does not contest the holding of the water court that the United States was not bound by the 1973 decree.

had reserved 2.67 cfs of water from the well. Finally, the United States was held entitled to antedation, with a May 29, 1936 date of priority.[12] Park Center was precluded from contesting the priority of the United States by virtue of the terms of its lease. Only Park Center appealed the ruling of the water court.

### III.

■ Both Park Center and the United States agree that *Denver I* provides the analytical foundation for determining the scope of the federal reserved water right in this case.[13] That doctrine was set forth by the United States Supreme Court in *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976):

> This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art.

IV., § 3, which permits federal regulation of federal lands. The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams.

Following the decisions of the United States Supreme Court in *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); and *Cappaert,* 426 U.S. 128, 96 S.Ct. 2062, we set out the following test for determining the scope of federal reserved water rights:

> For each federal claim of a reserved water right, the trier of fact must examine the documents reserving the land from the public domain and the underlying legislation authorizing the reservation; determine the precise federal purposes to be served by such legislation; determine whether water is essential for the primary purposes of the reservation; and finally determine the precise quantity of water—the minimal need as set forth in *Cappaert* and *New Mexico*—required for such purposes.

*Denver I,* 656 P.2d at 20.

The specific documents authorizing the reservation and the legislation authorizing the reservation are Public Water Reserve No. 107,[14] section 10 of the Stock Raising

**12.** Because the water court found that the United States was entitled to antedation, the date of priority would normally be the date the property containing the reserved water was withdrawn or reserved, September 27, 1934. *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976); *Denver I,* 656 P.2d at 30. May 29, 1936 was the priority date the United States asked for in its application, and the United States agreed to accept that date to avoid republication.

**13.** Because the parties agree that *Denver I* controls the scope of the federal reserved water rights, and since the case was argued in the water court and this court on that basis, we assume for purposes of this appeal, but do not decide, that the doctrine of federal reserved water rights applies to groundwater in the same way as it does to surface water. *Cf. Cappaert,* 426 U.S. at 142–43, 96 S.Ct. at 2071–72. *But see In re Rights to Use Water in Big Horn River,* 753 P.2d 76, 99–100 (Wyo.1988), *aff'd by an equally*

*divided Court sub nom. Wyoming v. United States,* —— U.S. ——, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989).

In addition, because we affirm the decision of the water court on the merits, it is not necessary for us to address the alternative basis of that decision, that Park Center is collaterally estopped from contesting the right of the United States to use the water. Accordingly, we express no opinion whether or not the doctrine of collateral estoppel was properly applied by the water court.

**14.** The executive order, Public Water Reserve No. 107, provides:

> Every smallest legal subdivision of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or waterhole and all land within one quarter of a mile of every spring or waterhole, located on unsurveyed public land, be and the same is hereby withdrawn from settlement, location, sale or entry, and reserved for public use in

Homestead Act,[15] and the Conversion Act. We have previously held that neither the executive order, nor section 10 of the Stock Raising Homestead Act reserved the entire yield of water from springs or waterholes on withdrawn land:

> The federal government's assertion, therefore, that the entire yield must be reserved is not well-founded. The purpose of the reservation was to prevent monopolization of water needed for domestic and stock watering purposes. The water court correctly ruled that the federal purposes could be satisfied with a quantifiable amount less than the entire yield of the springs and waterholes. The reserved rights doctrine only takes that amount of water "necessary to fulfill the purpose of the reservation, no more." [*Cappaert,*] 426 U.S. at 141, 96 S.Ct. at 2070. Here, as the water court found, the necessary amount is less than the entire yield. Reserved water from public springs and waterholes is available for the purposes of human and animal consumption in the amount necessary to prevent monopolization of the water resources.

*Denver I,* 656 P.2d at 32. Nevertheless, the water court decreed that the United States had reserved the entire yield of the Park Center well. The source of the reservation, therefore, must come from the Conversion Act (not at issue in *Denver I*), if this case is to be distinguished from *Denver I.* We have not considered the Conversion Act before, and we have not found any reported judicial decision in any other jurisdiction which has construed the Act.

The relevant portions of the Conversion Act are set out in full in footnote 3. Unlike the reservation documents in *Denver I,* the Conversion Act deals expressly with the production and leasing of water from wells. For example, subsection (a) provides that "the Secretary of the Interior may, *when such water is of such quality and quantity as to be valuable and usable at a reasonable cost for agricultural, domestic, or other purposes,*" purchase the well casing for a reasonable value. Subsection (c) states that "[t]he Secretary may make such purchase and may *lease or operate such wells for the purpose of producing water and of using the same on the public lands or of disposing of such water for beneficial use on other lands.*" Subsection (c) also makes it clear that the owners or occupants of lands adjacent to the well are given a preferential right to the beneficial use of the water.

Finally, subsection (d) explicitly contemplates that the *water* from the wells be sold to fund the continuation of the program initiated by the Conversion Act: "[T]he [Secretary of the Interior] may use the proceeds from the *sale or other disposition of such water* as a revolving fund for the continuation of such program, . . . ." [16]

We therefore agree with the water court in the conclusion that the United States, by virtue of the Conversion Act, reserved the right to the use of water flowing from the converted wells.[17] One purpose of the reservation, as it appears from the Conversion Act, was to provide water for beneficial use on reserved land, and private land adjacent to the reserved land on which the converted wells are located. Another purpose, however, was to sell the water at a reasonable

---

accordance with the provisions of Section 10 of the [Stock Raising Homestead Act].

**15.** 43 U.S.C. § 300 (repealed 1976).

**16.** Park Center argues that the deletion by Congress of certain references to the leasing or sale of water from subsection (c) of the Conversion Act, by means of amendments to the Act while it was in committee, evidence that Congress never intended the United States to have an ownership interest in water produced by the well. We have noted before that "legislative silence may mean many things." *Bell,* 724 P.2d at 637. The reference to the sale or leasing of water was not deleted from subsection (d) of the Conversion Act. We decline to speculate as to the meaning of the amendment of subsection (c) while in committee, since subsection (d) expressly refers to the sale or lease of water.

**17.** We also agree with the water court that it is unnecessary to decide whether the reservation of the water was explicit or implied. *Compare Cappaert,* 426 U.S. 128, 96 S.Ct. 2062 (express reservation of water) *with United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012 (implied reservation).

cost and to use the proceeds to convert more wells for the program. Unlike the Stock Raising Homestead Act, the purposes of the Conversion Act go beyond preventing the monopolization of water from waterholes. *Cf. Denver I*, 656 P.2d at 32.[18]

Finally, we must "determine the precise quantity of water—the minimal need as set forth in *Cappaert* and *New Mexico*—required for such purposes." *Denver I*, 656 P.2d at 20. In June 1935, a year before the well casing was purchased in 1936, the artesian water flow from the well was measured at 2.67 cfs, the same amount the water court found was reserved. The Conversion Act authorized the Secretary to purchase the well casing only if "such water is of such quality and *quantity* as to be valuable and usable at a reasonable cost for agricultural, domestic, or other purposes,...." (Emphasis added.) It is reasonable to assume that, before deciding to purchase the well casing, the United States took into account the quantity of water flowing from the well under artesian pressure. We therefore decline to overturn the water court's finding that the United States intended to lease, and therefore reserve, the entire flow from the well, and that the amount of water flow measured in 1935, prior to the purchase, and prior to the lease to Park Center or Canyon Heights in 1937, is no more than the amount of water needed to fulfill the purpose of the reservation.[19] Accordingly, we agree with the water court's determination that the United

States has reserved a right to 2.67 cfs of water from the Park Center well.

## IV.

■ The last issue is whether the United States is entitled to antedation of its reserved water right in the well. Antedation is appropriate only if the specific application for the use of the water from the Park Center well related back to the original application filed by the United States in 1979, the year in which it was first joined in a general adjudication of water rights that would encompass the Park Center well. *See Bell*, 724 P.2d at 642. Park Center contends that our decision in *Bell* forecloses the relation back of the specific amendments in this case. We disagree because we find *Bell* distinguishable.

In *Bell*, the United States claimed a right to antedation for a right to use the water from the main stem of the Colorado River. We first held that the water court had properly ruled that C.R.C.P. 15 applied to the adjudication of water court proceedings under the Water Right Determination and Administration Act of 1969, sections 37–92–101 to –602, 15 C.R.S. (1973 & 1988 Supp.). The water court had determined that amendment of the original application of the United States filed in 1971 was proper, and we agreed. *Bell*, 724 P.2d at 637. But the water court also refused to allow the amendment filed in 1983 to relate back under C.R.C.P. 15(c)[20] to the original application filed twelve years before. We concluded that the original application, which did not geographically encompass the main

18. As the United States points out, this conclusion is buttressed by contemporaneous regulations issued by the Secretary of the Interior which provide for the leasing of water from Conversion Act wells, in addition to the leasing of the premises. *See* 30 C.F.R. Part 241 (1939).

19. Before the water court, and before this court, the United States has represented that it seeks a right to use only the amount of water produced by artesian pressure, and does not claim that it can increase the flow from the well by artificial means, such as pumping, and have the increased flow relate back to the original reservation.

20. C.R.C.P. 15(c) provides, in pertinent part:
Whenever the claim or defense asserted in the amended pleading arose out of the con-

duct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment: (1) Has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

stem of the Colorado River, did not adequately advise the holders of 4400 water rights, based on claims adjudicated between 1971 and 1983, that the United States was claiming a right to the use of water from the Colorado River itself. *Bell*, 724 P.2d at 639.

In the present case, Park Center is not seriously contending that it was not put on notice of the potential claim of the United States in the Park Center well when the United States filed the original application in 1979.[21] Rather, Park Center maintains that, when 1980 came and went, and there was no specific application by the United States for a reserved water right to the well, it was justified in concluding that the United States would not claim such a right. This case, therefore, does not present the same unsettling of prior adjudications of water rights as did *Bell*. We conclude that, under the unique facts and circumstances of this case, the water court did not abuse its discretion in allowing the United States to amend its more general application by a specific application to a reserved water right in the Park Center well, and to allow that amendment to relate back.[22]

## V.

In summary, we affirm the holding of the water court that the United States is entitled to a reserved water right of 2.67 cfs from the Park Center well. In addition, we also affirm the finding of the water court that the priority date of this water right is May 29, 1936.[23]

---

21. Park Center was a party to the prior IBLA proceedings, and did have a lease with the United States pertaining to the well.

22. We thus do not reach the question of whether Park Center is estopped by the terms of its lease from claiming a water right in the well, and we express no opinion thereon.

