23 P.3d 117

In re SRBA Case No. 39576, Fish
And Wildlife Service, SRBA
Subcase No. 02–10063.

UNITED STATES of America, Appellant,

v.

STATE of Idaho; Pioneer Irrigation Dis-
trict, Newfoundland Partners, Payette
River Water Users, Association, Inc.,
Sun Valley Co., Thousand Springs
Ranch; J.R. Simplot Company; A & B
Irrigation District, Falls Irrigation Dis-
trict, Burley Irrigation District, Aber-
deen–Springfield Canal Company;
Boise–Kuna Irrigation District, New
York Irrigation District, Wilder Irriga-
tion District, Big Bend Irrigation Dis-
trict, Nampa & Meridian Irrigation Dis-
trict; Twin Falls Canal Company, North
Side Canal Company, Milner Irrigation
District; Grindstone Butte Mutual Ca-
nal Co., Allen Noble Farms, Inc., Cotton-
wood Canal Co., Farm Development
Corporation, G. Patrick Morris, FDC
(SC and GBP), Allen T. Noble, Sailor
Creek Water Company; Harrison Canal,
Burgess Canal, Progressive Irrigation
District, Enterprise Irrigation District,
Peoples Canal & Irrigation Co., New
Sweden Irrigation District, Snake River
Valley Irrigation District, Idaho Irriga-
tion District, Egin Bench Canals, Inc.,
North Fremont Canal Systems, Inc.;
Idaho Cities of Ashton, Bliss, Buhl, Bur-
ley, Cascade, Chubbuck, Council, Declo,
Donnelly, Eden, Emmett, Fairfield,
Fruitland, Garden City, Glenns Ferry,
Grand View, Hailey, Heyburn, Inkom,
Kuna, MacKay, Meridian, Middleton,
Minidoka, Mountain Home, Mud Lake,
Nampa, New Plymouth, Oakley, Parma,
Paul, Payette, Pocatello, Rigby, Ririe,
Roberts, Rupert, St. Anthony, Sugar
City, Ucon and Weiser, Eastern Western
Corporation, Basic American, Inc.,
Lamb–Weston, North Snake Ground
Water District; Idaho Ground Water
Appropriators, Respondents.

No. 25546.

Supreme Court of Idaho,
Twin Falls, November 2000 Term.

Feb. 22, 2001.

As Amended May 1, 2001.

Rehearing Denied May 1, 2001.

Hon. Betty H. Richardson, United States Attorney, Boise; United States Department of Justice, Denver, CO; United States Department of Justice, Washington DC, for appellant. Mark R. Haag, United States Department of Justice, Washington DC, argued.

Hon. Alan G. Lance, Attorney General, Boise, for respondent State of Idaho. Clive Strong, Deputy Attorney General, argued.

Elam & Burke, Boise, for respondents Pioneer Irrigation District, New Foundland Partners, Payette River Water Users, Sun Valley Co., and Thousand Springs Ranch. Did not participate in oral argument.

Terry T. Uhling, Boise, for respondent J.R. Simplot Company. Did not participate in oral argument.

Ling, Nielsen & Robinson, Rupert, for respondents A & B Irrigation District, Falls Irrigation District, Burley Irrigation District, and Aberdeen Springfield Canal Company. Roger Ling argued.

Hawley Troxell Ennis & Hawley, Boise, for respondents Boise Kuna Irrigation District, New York Irrigation District, Wilder Irrigation District, Big Bend Irrigation District, and Nampa & Meridian Irrigation District. Did not participate in oral argument.

Rosholt, Robertson & Tucker, Boise, for respondents Twin Falls Canal Company, North Side Canal Company, and Milner Irrigation District. Did not participate in oral argument.

Ringert, Clark, Chtd., Boise, for respondent Cottonwood Canal Company. Did not participate in oral argument.

Rigby Thatcher Andrus Rigby Kam & Moeller, Chtd., Rexburg, for respondents Harrison Canal, et al. Did not participate in oral argument.

Beeman & Hofstetter, P.C., Boise, for respondents Idaho Cities of Ashton, et al. Did not participate in oral argument.

Givens Pursley, LLC, Boise, for respondent Idaho Ground Water Appropriators, Inc. Did not participate in oral argument.

SCHROEDER, Justice.

This is an appeal from the Snake River Basin Adjudication (SRBA) district court decision denying the claim of the United States for reserved water rights in connection with approximately 94 islands distributed along 110 miles of the Snake River within the Deer Flat National Wildlife Refuge. The decision was made on cross motions for summary judgment. The decision of the SRBA district court is affirmed.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

The Deer Flat National Wildlife Refuge as it is known today is the product of the consolidation of the Snake River National Wildlife Refuge and the Deer Flat National Wildlife Refuge. The reservations at issue are distinct and involve two sets of islands, often referred to as "reaches." The upper reach spans from Swan Falls to Homedale and the lower reach spans from Homedale to Farewell Bend. Each reach has a separate history and was established by a separate reservation. In order to understand the nature of this controversy it is necessary to review the chain of land reservations that led to the present Deer Flat National Wildlife Refuge.

### A. The Lower Reach

The original "Deer Flat Reservation for the Protection of Wild Birds" was withdrawn from the public domain pursuant to Exec. Order No.1032 (February 25, 1909), which states in relevant part:

It is hereby ordered that the following reservoir sites ... Deer Flat and Minidoka, Idaho ... are hereby reserved, subject to Reclamation Service uses under the provisions of the act approved June 17, 1902 (32 Stat., 388) and to any other valid existing rights, and are set apart for the use of the Department of Agriculture as preserves and breeding grounds for native birds. It is unlawful for any person to hunt, trap, capture, willfully disturb or kill any bird of any kind whatever or take the eggs of such birds within the limits of these reservations, except under such rules

and regulations as may be prescribed by the Secretary of Agriculture. Warning is expressly given to all persons not to commit any of the acts herein enumerated and which are prohibited by law.

This reservation was located on Lake Lowell reservoir which was constructed pursuant to the Reclamation Act of June 17, 1902, ch. 1093, 32 Stat. 388.

Exec. Order No. 7655, 2 Fed.Reg. 1453 (1937),[1] established the "Deer Flat Migratory Waterfowl Refuge" on the same land withdrawn in Exec. Order No. 1032 and states in relevant part:

> in order to effectuate further the purposes of the Migratory Bird Conservation Act (45 Stat. 1222), it is ordered that all lands owned or controlled by the United States within the following-described area, comprising 10, 252.76 acres, more or less, in Canyon County, Idaho, be, and they are hereby, reserved and set apart for the use of the Department of Agriculture, subject to valid and existing rights, as a refuge and breeding ground for migratory birds and other wildlife. . . .
>
> . . . .
>
> Most of the above-described lands have been withdrawn for use in connection with the Deer Flat Reclamation Project and are primarily under the jurisdiction of the Department of the Interior; and the reservation herein made of such lands shall be subject to the use thereof by the said Department for reclamation work and incidental purposes.
>
> Executive Order No. 1032 of February 25, 1909, in so far as it reserved certain lands within a reservoir site in Idaho as the Deer Flat Bird Reservation, as modified, is hereby revoked.
>
> This refuge shall be known as the Deer Flat Migratory Waterfowl Refuge.

The United States claims no federal reserved water rights to the land surrounding Lake Lowell reservoir.

Public Land Order No. 3016, 28 Fed.Reg. 3658 (1963), added the island sector to the land reserved under Exec. Order No. 7655. This order withdrew islands referred to as the "lower reach" islands. The Order states in relevant part:

> Subject to valid existing rights, all islands owned by the United States within the exterior limits of the following described areas in the Snake River, Idaho, are hereby withdrawn from all forms of appropriation under the public land laws, including the mining laws and reserved for use of the Bureau of Sport Fisheries and Wildlife, United States Fish and Wildlife Service, as an addition to the Deer Flat National Wildlife Refuge, established by Executive Order No. 7655 . . .

**B. The Upper Reach**

Exec. Order No. 7691, 2 Fed.Reg. 1422 (1937), established the Snake River Migratory Waterfowl Refuge. This order withdrew islands referred to as the "upper reach" islands. The Order states in relevant part:

> in order to effectuate further the purposes of the Migratory Bird Conservation Act (45 Stat. 1222), it is ordered that all islands in the Snake River within the exterior limits of the following-described area, owned or controlled by the United States, or of which the United States has the use for migratory bird refuge purposes, be, and they are hereby, withdrawn from settlement, location, sale, or entry, and reserved and set apart, subject to valid existing rights, for the use of the Department of Agriculture as a refuge and breeding ground for migratory birds and other wildlife . . .

As a consequence of the executive orders, as of April 1963, there were two reservations containing islands within the Snake River— the Snake River National Wildlife Refuge and the island sector of the Deer Flat National Wildlife Refuge. Subsequently, Public Land Order No. 3110, 28 Fed.Reg. 6874 (1963), abolished the Snake River National Wildlife Refuge and consolidated it with the Deer Flat National Wildlife Refuge.

---

1. The reservation was made by President Franklin Roosevelt under the authority of the Pickett Act of June 25, 1910, ch. 421, 36 Stat. 847.

In May of 1968 Goose Egg Island was added to the Deer Flat Wildlife Refuge. Public Land Order No. 4425, 33 Fed.Reg. 8275 (1968).

## II.

### PROCEDURAL BACKGROUND

The United States filed its original claims for reserved water rights for the Snake River islands region of the Refuge in 1992 and filed amended claims in 1994 and 1997. The state of Idaho and other parties (hereinafter collectively referred to as "Objectors") objected to the claims of the United States. All parties filed cross-motions for summary judgment. The SRBA district court determined that it would consider the case in two stages, deciding first whether the United States was entitled to a reserved water right, and, if so, the second phase of the case would quantify that right. The SRBA district court held that the United States had no reserved water rights in the Refuge and dismissed the United States' claims without taking evidence as to the amount of water that would be necessary to satisfy the claims. The decision was certified as final under Idaho Rule of Civil Procedure 54(b), and the United States filed a notice of appeal. The state of Idaho filed a motion to dismiss the notice of appeal, claiming it was untimely filed. This Court denied that motion on June 30, 1999, and will address the issues in the appeal.

## III.

### STANDARD OF REVIEW

■ In an appeal from an order granting summary judgment, the Court applies the same standard of review as that used by the district court when originally ruling on the motion. *Mitchell v. Bingham Mem'l Hosp.,* 130 Idaho 420, 422, 942 P.2d 544, 546 (1997). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *First Security Bank v. Murphy,* 131 Idaho 787, 790, 964 P.2d 654, 657 (1998). The determination is to be based on the pleadings, depositions, and admissions on file, together with the affidavits, if any. *Id.,* see I.R.C.P. 56(c). Howev-

er, the Court will liberally construe the facts in favor of the party opposing the motion, together with all reasonable inferences from the evidence. *Mitchell,* 130 Idaho at 422, 942 P.2d at 546. Because there are no genuine issues of material fact, the issue of whether the reservations in this case established a federal reserved water right is a question of law. *See, e.g., United States v. City of Challis,* 133 Idaho 525, 529, 988 P.2d 1199, 1203 (1999).

## IV.

### THE LAW REGARDING FEDERAL WATER RIGHTS

This court has recently ruled on several cases regarding the doctrine of federal reserved water rights, including: *State v. United States,* 134 Idaho 940, 12 P.3d 1284 (2000)(regarding the Sawtooth National Recreation Area claims); *Potlatch Corp. v. United States,* 134 Idaho 916, 12 P.3d 1260 (2000) (regarding the Wilderness Act and Hells Canyon Recreation Act claims); and *Potlatch Corp. v. United States,* 134 Idaho 912, 12 P.3d 1256 (2000) (regarding the Wild and Scenic Rivers Act claims).

■ The existence or absence of a reserved water right is a matter of federal law. In its prior decisions this Court has relied solely upon United States Supreme Court cases and relevant federal executive and legislative history. Reliance of this Court upon its prior decisions is intended simply to incorporate reasoning based upon federal law, not imply that there is applicable state law.

■ In order to determine whether there is a basis for a federal reserved water right the Court will assess (1) whether there has been a reservation of land, and, if so, (2) whether the applicable acts of Congress contain an express reservation of water, and (3) if not, whether the applicable acts imply a reservation of water. *Potlatch Corp.,* 12 P.3d at 1263, *citing United States v. City of Challis,* 133 Idaho 525, 988 P.2d 1199 (1999). There is no dispute that the United States reserved islands within the Snake River in 1937 as part of the Snake River Migratory Waterfowl Refuge, and in 1963 as an addition to the Deer Flat National Wildlife Refuge. There is no dispute that there was no express reservation of water.

■ In deciding whether an implied reservation of water exists, the Court must determine whether it must be inferred that the executive body involved intended to reserve unappropriated waters. *Cappaert v. United States,* 426 U.S. 128, 139, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). "An intent to reserve water is inferred if water is necessary for the primary purposes of the reservation and if, without water, the purposes of the reservation will be entirely defeated." *State v. United States,* 12 P.3d at 1287, *citing United States v. New Mexico,* 438 U.S. 696, 700, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). "[T]he implied-reservation-of-water-rights doctrine ... reserves only the amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert* 426 U.S. at 141, 96 S.Ct. 2062. The necessity of water must be so great that without the water the reservation would be "entirely defeated." *New Mexico,* 438 U.S. at 702, 98 S.Ct. 3012. If however, water is only necessary for a secondary purpose of the reservation, the United States must "acquire water in the same manner as any other public or private appropriator." *Id.*

■ As in this case, "[w]here a reservation of public land for a particular purpose does not expressly declare that water is needed as a primary use to accomplish the purpose of the reservation, or the exact purpose of the reservation is not clearly set forth in terms readily demonstrating the necessity for the use of water, the courts must consider the relevant acts, enabling legislation and history surrounding the particular reservation under review to determine if a federal reserved water right exists." *United States v. State,* 131 Idaho 468, 470, 959 P.2d 449, 451 (1998).

## V.

### HISTORICAL CONTEXT OF THE RESERVATIONS

#### A. The Purpose Of The Migratory Bird Conservation Act

The reservations at issue in this case were made pursuant to executive orders and public land orders, some of which were stated to "effectuate further" the purposes of the Migratory Bird Conservation Act.[2] Prior to any government involvement in the area of conservation of migratory birds, waterfowl or other game birds, the species were rapidly approaching extinction due to their ongoing and indiscriminate slaughter. 70 CONG. REC. H3176 (February 25, 1929) (statement of Rep. Andresen). These insectivorous birds were recognized to have great value in agriculture by destroying insects and preserving field crops. A decline in their population meant a large loss to farmers. *Id.*

The Migratory Bird Conservation Act resulted from the migratory bird treaty entered into with Great Britain to lessen the dangers to migratory birds by providing them with inviolate and permanent sanctuaries for resting and feeding. *Id.* at H3177 (statement of Rep Andresen). Prior to the enactment of the Migratory Bird Conservation Act, similar Acts had been presented to Congress and failed. The first Migratory Bird Conservation Act would have required every hunter to procure a federal hunting license, and the funds realized by license sales would be used to purchase migratory bird preserves. *Id.* at H3178 (statement of Rep. Kincheloe). The second Migratory Bird Conservation Act, in addition to the license fee, gave the Secretary of Agriculture the discretion to open up the sanctuaries at specified intervals and allow hunting. *Id.* Neither of the above proposals passed in Congress. The Migratory Bird Conservation Act as it finally passed eliminated the license fee provision and the open hunting provision.

The agenda of the Act was to survey available sites along migration routes, then buy land and establish sanctuaries nationwide to preserve the insectivorous birds for the future by providing nesting, feeding and resting grounds where the birds could not be molested by hunters. *Id.* at H3176 (statement of Rep. Andresen). The main goal of the Migratory Bird Conservation Act was

---

**2.** Exec. Order No. 7655 and 7691 both state: "in order to effectuate the purposes of the Migratory Bird Conservation Act."

that hunting on game preserves "under no circumstances would be allowed under the terms of this bill." *Id.* at H3179 (statement of Rep. Jones).

## B. The Evolution Of Deer Flat

When the first "Deer Flat Reservation for the Protection of Wild Birds" was created by Exec. Order No.1032 in 1909, it was "reserved" subject to reclamation services that were already present in the area. The emphasis of the order was that it was unlawful to "hunt, trap, capture, willfully disturb or kill any bird of any kind . . . or take the eggs of such birds . . ." while in the reservation. During oral hearings on the Migratory Bird Conservation Act, members of the house contemplated continuing to superimpose refuges onto already owned federal land, particularly reclamation projects. 70 CONG. REC. H3173 (February 25, 1929) (statement of Rep. Leavitt) and H3177 (statement of Rep. Leavitt).

In 1937, Exec. Order No. 7655 revoked and replaced Exec. Order No.1032, reserving the same land, and renaming it the Deer Flat Migratory Waterfowl Refuge, in order to "effectuate the purposes of the Migratory Bird Conservation Act. . . ." That Order acknowledged that the reserved land was used in connection with the Deer Flat Reclamation Project under the jurisdiction of the Department of Interior and that the reservation remained subject to the use of the Department of Reclamation. In 1963, islands were reserved and added to the Deer Flat National Wildlife Refuge[3] by Public Land Order No. 3016. The Order contained no language regarding the reservation of water. The Order simply labeled the land reserved as "islands."

The other region of islands at issue in this case, those formerly belonging to the Snake River Migratory Waterfowl Refuge, were reserved separately by Executive Order No. 7691 in 1937. This Order, like Executive Order No. 7655, contained the language "in order to effectuate the purposes of the Migratory Bird Conservation Act." The two refuges were consolidated pursuant to Public

Land Order No. 3110 in 1963. This Order abolished the Snake River National Wildlife Refuge, and lands then comprising that refuge were transferred and consolidated with the Deer Flat National Wildlife Refuge.

## C. The Relationship Of Reclamation Projects Affecting The Snake River

From the time the reservations at issue were made, the areas they comprise were subject to major reclamation projects that regulated the flow of the Snake River. This was not happenstance. The reclamation projects that changed the Snake River from a free flowing river to a controlled river, play an integral part of the analysis of issues in this case.

Islands in the lower reach were withdrawn from the public domain in 1909. Exec. Order 1032 reserved the "reservoir sites . . . Deer Flat and Minidoka, Idaho . . . subject to Reclamation Service uses." At the time the Order was signed, the Deer Flat site in Canyon County consisted of three dams: the Upper, Lower and Middle. Construction began on these dams in 1906. Construction of the Minidoka Dam, built as part of the larger Minidoka Project, began in 1904.

In 1937, Exec. Order 7655 revoked and modified Exec. Order 1032, designating the same land reserved under the prior Order as under the jurisdiction of the Department of Interior. Also in 1937, Exec. Order 7691 withdrew islands referred to as the upper reach islands of the Snake River.

By 1937 the Bureau of Reclamation had constructed several storage dams and reservoirs on the Snake River and its tributaries including Minidoka Project facilities: Jackson Lake Dam and Lake Walcott, constructed 1910–1911; American Falls Dam and Reservoir, originally constructed 1925–1927, reconstructed 1976–1978; Island Lake Dam and Island Park Reservoir, constructed 1935–1938; Grassy Lake Dam and Reservoir, constructed 1937–1939; and Cascade Creek Diversion Dam, constructed 1937. In addition, The Little Wood River Dam and

---

3. The name of the refuge was changed from the Deer Flat Migratory Waterfowl Refuge to the Deer Flat National Wildlife Refuge pursuant

Proclamation No. 2146 of July 25, 1940 (54 Stat. 2720).

Reservoir was constructed 1936–1939 and enlarged 1958–1960, and the Blackfoot Dam and Reservoir was constructed 1909–1911.

Following the reservations in 1937, reclamation activities continued on the Snake River and its tributaries due to the need for additional water storage. These reclamation projects include: The Palisades Dam and Reservoir, built as part of the larger Palisades Project, constructed 1951–1957; the Ririe Dam and Reservoir, constructed 1970–1977; the Milner Diversion Dam, constructed 1928; the Teton Dam and Reservoir, as part of the larger Teton Basin Reclamation Project, constructed 1972–1975; and the Cross Cut Diversion Dam, an addition to the Minidoka Project, constructed 1938.

In 1963, Public Land Order 3016 reserved the island sector of the land reserved under Exec. Order 7655, referred to as the lower reach islands. By 1963, the water in the Snake River had effectively been controlled and regulated. The islands were chosen because they provided a suitable refuge environment and because the flows could be regulated given the upstream reclamation projects.

### D. The Purposes Of The Reservations At Issue In This Case Do Not Provide A Basis For A Federal Reserved Water Right.

■ There is no dispute that the United States withdrew land from the public domain in 1937 and 1963 respectively by reserving the islands in the Snake River. At the time the reservations were made, the purpose was to create sanctuaries for migratory birds to protect them from hunters and trappers so they would not become extinct and so they could continue to benefit husbandry.[4]

■ Implied water rights must be recognized if failing to do so will defeat the purposes of the reservation. *New Mexico,* 438 U.S. at 700, 98 S.Ct. 3012. "[T]he implied-reservation-of-water-rights doctrine ... reserves only the amount of water necessary to fulfill the purpose of the reservation, no

more." *Cappaert* 426 U.S. at 141, 96 S.Ct. 2062. As was the case in *Potlatch Corp. v. United States* with regard to reservations made under the Wilderness Act, in this case there is no standard by which quantification of the amount of water can be determined for the reservation, that is, how much water must be present for an island to exist? Unlike *Cappaert* where specific quantification could be determined to preserve the endangered fish, or *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), where the amount necessary to irrigate the land could be quantified, there is no standard for the amount of water necessary to have an island. This Court has held that "[a]bsence of any standard for quantification is indicative of the fact that quantification was not meant to be determined." *Potlatch Corp.,* 12 P.3d at 1266.

■ By definition an island is surrounded by some amount of water; however, the necessity of water must be so great that without the water the purpose of the reservation will be entirely defeated. *New Mexico,* 438 U.S. at 702, 98 S.Ct. 3012. It is the purpose of the reservation at issue, not the definition of the land reserved. The purpose that is in question of being defeated is the creation of sanctuaries for migratory birds. As reflected in a *Letter from J. Clark Slayer II, Supervisor of the Migratory Waterfowl division, to the Chief of the Biological Survey, United States Department of Agriculture, July 30, 1936,* the principal object of the withdrawal of the upper reach islands was to reserve the islands already owned by the United States and purchase as many remaining islands as possible for safe (hunting prohibited) nesting and resting places for migratory birds before the land was exploited by unsound agricultural practices and grazing. However, simply reserving an area of land where certain species are attracted, without more, does not constitute a reservation of water.

---

**4.** Many of the birds were insectivorous and beneficial to agriculture because of their preservation of field crops. It was estimated that one bird could potentially destroy hundreds of insects a day, insects that feed on and damaged crops through insect-borne disease. 70 CONG. REC. H3176 (1929) (statement of Rep. Andresen).

 The United States Supreme Court has made clear that the question of implied intent to reserve water is based on the specific purposes for which the land was originally reserved. *New Mexico* 438 U.S. at 713–715, 98 S.Ct. 3012. The United States has not shown that the principal objects of the reservations will be defeated without a reserved water right. Hunting is still prohibited and migratory birds still have a sanctuary without a federal reserved water right. Without water there would be no island, but there would be a sanctuary as defined by the Migratory Bird Conservation Act. Even if it were shown that the purpose of the island reservations has evolved over the years to include maintaining the riparian habitat provided by islands or to foster isolation from predators, those purposes were not present at the time of the reservations. Present day desires cannot be imposed as purposes on past decisions if those purposes were not present at the time of the reservation.

 One can assume that there was an expectation that the "islands" would remain surrounded by water, but that does not equate to an intent to reserve a federal water right to accomplish that purpose. The two concepts are not equivalent. The United States cannot claim by default that an implied reservation exists when it cannot be inferred there was an intent to reserve federal water rights at the creation of the reservation.

Several federal agencies spoke to the issue of water during the time of the reservations, never framing the issue of water in the context of a reserved right. A *Memorandum of the Supervisor of the Migratory Waterfowl Division of the Bureau of Biological Survey, United States Department of Agriculture, to the Chief of the Bureau of Biological Survey, United States Department of Agriculture, July 30, 1936,* states: "[o]bserve, further, that Snake River, in Idaho flows through the arid or semi-arid region and we have reason to believe that much of its water has been appropriated for irrigation and other lawful purposes, which might result in land uncovering...." Or in *Examination Report on Migratory Bird Refuges, Supplemental Report—Snake River Migratory Waterfowl Refuge, United States Department of Agriculture, Division of Biological Survey, Division of Land Acquisition, November 18, 1935,* under the heading of "Water Rights" it is stated:

> On the east side of the river, most of the farming land is irrigated by water from the Deer Flat Reservoir. On the west side of the river there are two large pumping plants taking water out of the river during the farming season for irrigation purposes. There was also found a small pumping outfit taking water only for irrigation of one small ranch. Of course there is no danger of the water level of the river being lowered by the activities of these pumps. Local residents say that the principal factor in preventing water level fluctuations are the numerous dams and reservoirs upstream. They say that the water levels do not vary more than a foot at the most during the year.

> All land holders in these irrigation districts are allotted water in proportion to the acreage of land that they hold. There is no priority of water rights in these lands in an irrigation district, the water in the reservoir merely being divided up among the land holders in the district according to the amount of land they hold in the district.

In addition, the wording of the Migratory Bird Conservation Act itself indicates that if the Migratory Bird Conservation Commission considers any piece of land, water, or land and water for withdrawal "that it may be recommended by the Secretary of the Interior for purchase or rental under this subchapter" and such purchase or rental must be approved by the Commission. 16 U.S.C. § 715a. The Act itself expressly contemplates the purchase of water. However, neither Public Land Order No. 3016 nor Exec. Order No. 7691 included any language regarding purchase or acquisition of water rights.

The circumstances of the reservations and the purposes of the reservations do not support a claim for a federal implied water right.

### E. Secondary Use In This Case Does Not Support An Implied Water Right.

 The United States Supreme Court in *Arizona v. California,* 373 U.S. 546,

601, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), found that the "United States intended to reserve water sufficient for the future requirements" of the Havasu Lake National Wildlife Refuge and the Imperial National Wildlife Refuge—finding an implied federal reserved water right.[5] *Id.* at 601. The reservations in *Arizona* contained the language "for the use of the Department of Interior as a refuge and breeding ground for migratory birds and other wildlife" and were designated in existing reclamation projects.[6] However, these reservations were not made pursuant to the Migratory Bird Conservation Act. The primary purpose of the Migratory Bird Conservation Act was to prevent the possible extinction of migratory birds, to create sanctuaries where migratory birds could rest, feed and nest without the threat of hunters, and to promote the increase of their populations to assist farmers with insect control. In addition, since the Supreme Court decision in *Arizona*, the Supreme Court decided *New Mexico*, which establishes in very clear terms that implied water rights must be recognized, if failing to do so will defeat the primary purpose of the reservation. *New Mexico*, 438 U.S. at 700, 98 S.Ct. 3012. The primary purpose of the Migratory Bird Conservation Act will not be defeated without a federal reserved water right. The secondary purpose, as set forth by the United States is that islands (surrounded by water) are necessary to provide isolation from predators, proximity to open water, and riparian habitat. Although the goal of these purposes may appear similar, the means chosen are not. It is clear that the United States chose to reserve the islands to create sanctuaries for migratory birds. However, the islands exist in their current state because of the reclamation projects on Snake River, and, according to historical documents, the United States not only was aware of this fact but based its decision to reserve these islands on this fact.

5. *Arizona* includes a one paragraph "holding" that implied federal water rights are recognized in this area, but the Court did not give any further detail as to the basis of that holding.

6. The Imperial National Wildlife Refuge was subject to the use of the Colorado River Storage

Of course there is no danger of the water level of the river being lowered by the activities of these pumps. Local residents say that the principal factor in preventing water level fluctuations are the numerous dams and reservoirs upstream. They say that the water levels do not vary more that a foot at the most during the year.

*Examination Report on Migratory Bird Refuges, Supplemental Report, Snake River Migratory Waterfowl Refuge, United States Department of Agriculture, Division of Biological Survey, Division of Land Acquisition,* November 18, 1935.

Use of water on the island is not anticipated, but if such use becomes desirable, applicable laws and procedures relating to the control, appropriation, use, and distribution of water by the United States will be observed.

*Memorandum from Acting Regional Director, Bureau of Sport Fisheries and Wildlife, to State Director, Bureau of Land Management,* November 20, 1962.

Pursuant to the Reclamation Act of 1902, appropriation of water is controlled by state law. *California v. United States*, 438 U.S. 645, 675, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).

All of these steps make plain that [the Reclamation] projects were designed, constructed and completed according to the pattern of state law as provided in the Reclamation Act. We can say here what was said in *Ickes v. Fox*, [300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937) ]: 'Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights becomes vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water rights be-

Project, Exec. Order No. 8685, 6 Fed.Reg. 1016 (February 14, 1941). The Havasu Lake National Wildlife Refuge was subject to the use of the Parker Dam Project, Exec. Order No. 8647, 6 Fed.Reg. 593 (January 22, 1941).

came the property of the land owners, wholly distinct from the property right of the government in the irrigation works.... The government was and remained simply a carrier and distributor of water ..., with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works.'

*Id.* at 677, 98 S.Ct. 2985.

█ If water is only necessary for a secondary purpose of the reservation, the United States must "acquire water in the same manner as any other public or private appropriator." *New Mexico* 438 U.S. at 702, 98 S.Ct. 3012. The reservations at issue in this case were not primary to the land in the sense that implied federal reserved water rights are applied, because the island/refuge nature of the reservations was always secondary to reclamation. See *Memorandum from Regional Refuge Supervisor, Department of Fish and Wildlife, Department of Interior, to Regional Director, Department of fish and Wildlife, Department of Interior,* May 13, 1957. The United States argues that these reservations were separate because they were islands not within the Deer Flat Reclamation Project. This is incorrect. There is nothing in Exec. Order No. 7691 or Public Land Order No. 3016 that exempts or separates the reservations of islands from the umbrella of the Deer Flat National Wildlife Refuge, which has a purpose that was and is clearly ancillary to the management purposes of the Department of Reclamation and Department of Interior. If the United States intended to reserve water within the Refuge, that goal was ignored by the subsequent reclamation projects of the United States on the Snake River. The development of reclamation projects by the United States would be in direct conflict with a reservation of water for the purposes claimed in this case. Given the historical context of the West in regard to reclamation, agriculture and public works in general, it defies

reason to believe that preference was intended for migratory birds over farming.

█ The United States has control of reclamation for the benefit of irrigators.[7] The State of Idaho controls what happens to that water. If the United States needed a reserved water right, there were procedures to obtain it. From what can be gleaned from the memoranda and other documents created prior to the making of the reservations, it is evident that the United States expected the water to continue to flow. It is also clear the United States did not intend to reserve water at the time the land was withdrawn as such a reservation was not essential to fulfill the purpose of the Migratory Bird Conservation Act and, in addition, would frustrate the United States' control of its own reclamation activities.

If the Court were to adopt the position of the United States, the Court would have to find that the water intended to be stored and regulated by colossal federal projects for the past 98 years would now be subordinated to the need to preserve water for the islands. The historical context of the designations and the language of the reservations rebuts the position of the United States. Reclamation was the primary concern of the developments in the Snake River. The process of reclamation enhanced the ability to designate islands as safe havens for migratory birds. The two concepts work well together.

█ Two points of history and logic stand in the way of the position of the United States: The reclamation projects themselves assured that there would be sufficient water to maintain the islands without a federal reserved right. That assumption underlies the creation of the refuges. The only way that this reality fails is if there is a catastrophic drought or other natural disaster that threatens to dry up the river. Should that occur, the second barrier to the United States claim arises. It is inconceivable that President Roosevelt in 1937, in the context of the dust bowl years, intended to give preference to waterfowl, or any other migratory

---

7. "Section 9(c) of the Reclamation Project Act of 1939 ... provides: 'No contract relating to municipal water supply or miscellaneous purposes ... shall be made unless, in the judgment of the

Secretary [of the Interior], it will not impair the efficiency of the project for irrigation purposes.' " *California v. United States,* 438 U.S. at 671, n. 24, 98 S.Ct. 2985.

bird, over people. The reclamation projects themselves assure that water in the Snake River will be controlled for the benefit of agriculture. The secondary effect is that there will be water in the river to preserve the islands, absent natural catastrophe. The history of the developments controlling the Snake River makes it clear that the State's right to control the water for the benefit of humans was the primary focus. That is consistent with the preservation of waterfowl habitats on the river. If nature requires a choice, the recognition of water rights for people will prevail. There is no implied federal water right for the preservation of islands that will trump the primary purposes of reclamation. It is the authority and intentions of the concerned presidents and other executives that is in issue, not subsequent agency agendas. The presidents and other executives promulgating policy had the ability, and most likely the knowledge, that they could reserve a federal water right if that were essential. They did not do so expressly. And they did not do so by implication, considering the historical context in which they acted.

## VI.

### CONCLUSION

The decision of the district court denying the claim of the United States for a reserved water right is affirmed. No costs or attorney fees are allowed.

TROUT, C.J., WALTERS, KIDWELL, JJ. and Justice Pro Tem McKEE, concur.